**Gregory BERRY, et al., Plaintiffs,**

v.

**SONOMA COUNTY, et al., Defendants.**

**Civ. No. C–89–4476 SAW (FSL).**

United States District Court,
N.D. California.

Feb. 28, 1992.

On Motion to Reconsider May 1, 1992.

See also 763 F.Supp. 1055.

W. David Holsberry of Davis, Cowell & Bowe, San Francisco, Cal., for plaintiffs.

Patrick G. Grattan and Steven C. Mitchell of Geary, Shea, O'Donnell & Grattan, Santa Rosa, Cal., for defendants.

## MEMORANDUM OPINION

LANGFORD, Chief United States Magistrate Judge.

This matter was tried before the court November 12–16, 1991. Appearing for plaintiffs was W. David Holsberry, Esq. of Davis, Cowell and Bowe, San Francisco. Appearing for defendants was Patrick G. Grattan, Esq. and Steven C. Mitchell, Esq. of Geary, Shea, O'Donnell and Grattan, Santa Rosa. Both sides presented exhibits and testimony of witnesses. After the trial concluded, counsel submitted post-trial briefs and rebuttal briefs and proposed findings of fact and conclusions of law. The case was submitted December 20, 1991.

The evidence having been considered and good cause appearing, this court hereby finds for plaintiffs. Plaintiffs shall submit a cost bill and declarations supporting an

award of attorney's fees. The court does not award liquidated damages.

## FACTUAL BACKGROUND

The question presented in this case is whether the Fair Labor Standards Act of 1938 ("the FLSA"), 29 U.S.C. §§ 201 *et seq.*, requires defendants to pay overtime compensation to plaintiffs for each hour spent "on-call" from December 1986 to the present. Plaintiffs' claim for compensatory damages totals over $200,000. Liquidated damages would bring the amount claimed to over $400,000. This action was brought by Gregory Berry, Philip Marcus, Dennis McAllister and Francis Oravetz, current and former deputy coroners employed by the Sonoma County Sheriff's Department. Defendants are Sonoma County; Sonoma County Board of Supervisors; Richard Michaelson, Sonoma County Sheriff, and Janet Nicholas, James Harberson, Tim Smithy, Nick Esposti, and Ernest Carpenter, members of the Board of Supervisors.

Plaintiffs are law enforcement employees of the Sonoma County Sheriff's Department.[1] At all times relevant to this litigation, the Sheriff's Department has employed only three deputy coroners at any one time. Although the Coroner's Office's regular business hours are Monday through Friday, 8 a.m. to 5 p.m., coroners are required by California statute to respond to certain reported deaths twenty-four hours a day, seven days a week. *See* Cal.Gov't Code §§ 27491 *et seq.;* Cal. Health & Safety Code §§ 10250 *et seq.*

Pursuant to 29 U.S.C. § 207(k), the Sonoma County Sheriff's Department has established a fourteen-day work period. In each work period, plaintiffs are regularly scheduled to work eight ten-hour shifts, for a total of eighty hours. In addition, the coroners are required as a condition of their employment, to work many extra hours on an "on-call" basis to fulfill the Coroner's Office's statutory obligation to be available at all times. One coroner is always on-call during after-business hours.

For example, under the schedule in place since October, 1990, approximately 71 hours per week were covered by the coroners on an on-call basis. These 71 hours were divided among the then-current coroners as follows: Berry worked 30 hours per week on-call, McAllister worked 20, and Oravetz worked 21.[2]

In accordance with the FLSA, the County pays the coroners overtime compensation, at a rate of one and one-half times their regular pay, for all hours worked in excess of eighty-six hours per work period. *See* 29 U.S.C. § 207(k); 29 C.F.R. § 553.230(c). Plaintiffs receive overtime pay for all hours actually *worked* during their on-call time, but receive no specified compensation for each hour spent on-call, but not working.

The precise manner in which the coroners are required to conduct their duties while on-call is disputed. It is safe to say that when certain categories of deaths are reported to the Coroner's Office after hours, the Sheriff's Department dispatcher contacts the on-call deputy coroner.[3] That coroner must be available by pager, telephone or the two-way radio in the coroner's county vehicle to respond to any such inquiry or death report. The coroner is often able to answer these inquiries and handle investigations over the telephone, in the same way that most investigations are handled on-duty, as well. He is guaranteed a minimum of one hour's overtime compensation for on-call time spent on the telephone. Some reports require the coroner to "call back," i.e. report in person to the Coroner's Office in Santa Rosa or to the death scene itself. Although the parties dispute the degree of flexibility the coroners have to deal with calls received during on-call hours, at a minimum it can be said that the

---

1. "Law enforcement activities" is defined in 29 C.F.R. § 553.211.

2. The fourth plaintiff, Marcus, left the employ of the Coroner's Office in November 1988, Berry left in September, 1991.

3. Section 27491 of the California Government Code describes those deaths requiring a coroner inquiry. Generally speaking, the Coroner must investigate all violent, sudden, unusual, and unattended deaths. *Id.*

frequency and unpredictability of these calls circumscribes the coroners' ability to participate in personal activities and often disrupts their sleep.

Plaintiffs contend that because of the excessive restrictions on their freedom to engage in personal pursuits during their on-call hours, these hours count as "hours worked" under the FLSA. Accordingly, they urge the court to award them backpay for *all* hours worked on-call, liquidated damages, and attorney's fees. Defendants counter that under the circumstances of this case, plaintiffs are entitled to compensation only for on-call hours actually spent responding to calls, and that, in fact, plaintiffs are compensated for being on-call by the 5% premium pay negotiated by the parties.

## PROCEDURAL BACKGROUND

The District Court denied the parties' cross-motions for summary judgment, finding disputed facts relating to the flexibility with which the coroners can contend with their on-call responsibilities, i.e.: To what extent the coroners can and do engage in personal pursuits during on-call hours; the amount of time coroners have to respond to calls; the ease with which they can trade on-call responsibilities; whether they may transport family members in their county vehicles, or whether family members must travel in separate cars; whether they must remain in Sonoma County; the number and frequency of miscellaneous work-related calls they receive which are not reflected in the Coroner's Office statistics; whether plaintiffs' on-call duties are similar to and as demanding as their regular duties; the frequency with which they are "called back" to a death site or to the Coroner's Office.

The court also found disputed material issues relating to damages. Assuming that the FLSA requires defendants to pay plaintiffs backpay for all on-call time, the parties dispute whether defendants "wilfully" violated the Act and whether their purported violation was committed in bad faith. The statute of limitations for "wilful" violations of the Act is three years, but only two years for non-wilful violations. 29 U.S.C. § 255(a). In addition to backpay, employers in violation of the FLSA must pay liquidated damages in an amount equal to the unpaid overtime compensation. 29 U.S.C. § 216(b), unless their violation of the Act was in "good faith." 29 U.S.C. §§ 259–260.

The District Court found genuine disputed issues related to defendants' wilfulness and bad faith in allegedly violating the FLSA.

With both sides ready for trial, they were referred by the District Court to a magistrate judge, and consented to proceed before the magistrate judge.

The case was tried before the court for five days, during which time the parties presented exhibits and the testimony of witnesses.

## FAIR LABOR STANDARDS ACT

The Fair Labor Standards Act (hereafter "FLSA") (29 U.S.C. § 207) provides federal standards for the protection of workers, including the minimum wage, maximum hours, investigations, inspections, homework regulations, child labor, exemptions from required standards, student and handicapped workers and overtime compensation.

## OVERTIME COMPENSATION

Guidance on the issue of when an employee should be compensated for on-call time is provided by 29 C.F.R. § 785.17 which provides:

> An employee who is required to remain on-call on the employer's premises or so close thereto that it cannot use the time effectively for its own purposes is working while "on-call." An employee who is not required to remain on the employer's premises but merely required to leave word at his home or with company officials where he may be reached is not working while on-call.

Further guidance is set forth in 5 C.F.R. § 551.431 (1989) which states:

(a) An employee will be considered on duty and time spent on standby duty shall be considered hours of work if:

(1) The employee is restricted to an agency's premises, or so close thereto that the employees cannot use the time effectively for his or her own purposes; or

(2) The employee, although not restricted to the agency's premises:

(i) Is restricted to his or her living quarters or designated post of duty;

(ii) Has his or her activities substantially limited; and

(iii) Is required to remain in a state of readiness to perform work.

(b) An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:

(1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius, or;

(2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

and furthermore, 29 C.F.R. § 553.221(d) (1989) provides, in pertinent part:

... where the conditions placed on the employee's activities are so restricted that the employee cannot use the time effectively for personal pursuits, such time spent on-call is compensable.

## PUBLIC EMPLOYEES: GARCIA DECISION

 The United States Supreme Court held in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), that the FLSA applied to local government entities. In general, the FLSA requires that employers pay overtime compensation to employees for hours worked in excess of forty hours per work week. 29 U.S.C. § 207(a). Because of their peculiar work schedules, however, the FLSA has established a special set of rules for fire protection and law enforcement employees. *See* 29 U.S.C. § 207(k).

No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if—

(1) In a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2) In the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty in which the aggregate exceed the number of hours which bears the same ration to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in Clause (B) of paragraph (1)) bears to 28 days, compensation at a rate not less than one and one-half times the regular rate at which he is employed.

## ANALYSIS

The issue of overtime compensation for on-call work is a matter of first impression in this District and has not been considered comprehensively in the U.S. Court of Appeals for the Ninth Circuit. In addition, plaintiffs raise two issues which are apparently unique in this area of inquiry: the issue of work-related *telephone* interruptions during on-call time and the issue of the unpredictability of calls, either calls requiring a telephone response or calls requiring an in-person response.

After considering the record, the pleadings and the applicable law, the court has determined the following to be the critical factors in this case:

1) Whether plaintiffs' on-call duties are similar to and as demanding as their regular duties;

2) Required response time;

3) Frequency of calls during on-call hours;

4) Number and frequency of miscellaneous work-related calls received which are not reflected in the Coroner's Office statistics;

5) Geographic restrictions;

6) Use of a pager;

7) Ease with which on-call employees can trade on-call responsibilities;

8) Extent of personal activities engaged in during on-call time;

9) Whether coroner investigators may transport family members in their county vehicles, or whether family members must travel in separate cars;

10) Existence and provisions of any agreement between the parties governing on-call work;

11) County's wilfulness or bad faith in violating the FLSA.

## CONCLUSIONS OF LAW

### 1) WHETHER PLAINTIFFS' ON–CALL DUTIES ARE SIMILAR TO AND AS DEMANDING AS THEIR REGULAR DUTIES

If plaintiffs' on-call duties are similar to and as demanding as their regular duties, then this, along with other factors, would tend to show restrictions on their ability to pursue personal activities and that their on-call time is compensable. *Townsend v. Mercy Hosp. of Pittsburgh*, 862 F.2d 1009 (3rd Cir.1988).

In the *Townsend* case, plaintiffs were operating room personnel who worked standby shifts in addition to their regular shifts. They were paid at their regular overtime rate for hours actually worked, that is, if they were called in to assist at surgery. They were paid minimum wage at time and a half for the hours spent on standby. They were required to be present on the employer's premises but they were

permitted to read, watch television and sleep while on-call. The court held that they were only working at their regular job while they were assisting in the operating room and that their employer could compensate them at the lower rate of minimum wage for standby time. The court found that the actual work done on-call was substantially the same as work done during regular hours. *Id.* at 1012.

Plaintiffs testified to the components of a death investigation into the circumstances, cause and manner of death, as required by § 27491 of the California Government Code. Coroners arrange for identification of the body, notify family members of the death, refer them for appropriate social services, contact transplant services regarding potential organ donations, and inventory and secure property, until it may be released to a responsible person. Coroners also secure a copy of the decedent's will and sometimes file it with the County Clerk. They also cooperate with other public officers, including the Public Guardian, and other health and law enforcement personnel who may be involved in the investigation. The coroner arranges for an autopsy in cases of suspected homicide, suicide, traffic death or medically unattended death. The coroner prepares a report, which varies in length. A typical investigation may be concluded in fifteen minutes or may require the coroner's time over several months until it is concluded, and the coroner signs the death certificate.

The deputy coroner also prepares a brief preliminary report on a death which is not reportable under the Government Code, i.e. the death of someone who has been under a physician's care within the past twenty days, or in a hospital within the past twenty-four hours, who dies of natural causes. In such a case, called a "no case," the attending physician signs the death certificate. (Pl.Ex. 1—Policy and Procedure Manual, Pl.Ex. 2—Coroner Office Protocol, Testimony of Oravetz).

Defendants in this case contend that on-call investigations are not as comprehensive as on-duty investigations. They claim

that the deputy coroners simply stabilize a case as best they can and complete their investigation during their next on-duty shift. Defendants and plaintiffs alike testified that the deputy coroners can only telephone doctors' offices and many other agencies during normal business hours, not between midnight and 7 a.m., when three quarters of all on-call hours fall. (Oravetz testimony).

Plaintiffs here claim that they conduct on-call investigations as thoroughly and completely as on-duty investigations. On-call time and on-duty time are, for all practical purposes, interchangeable. When an on-duty deputy was absent either for a day or for a lengthy period, his shift was simply converted to on-call and handled by the remaining deputies. In this regard, a shift on which all hours would normally be compensable, would be handled on an on-call basis. Also undisputed was the fact that deputies occasionally worked at home while on duty and occasionally worked at the office while on-call, sometimes even sleeping there. Generally, however, on-call investigations would be handled from outside the Coroner's Office, most often from the deputy coroners' homes, while on-duty investigations were handled from the Coroner's Office.

The testimony was uniform that in comparing an on-call investigation with an on-duty investigation the deputy had the same responsibility and discretion, observed the same response time, and conducted investigations to the fullest extent possible at the time the death report was received.

As with on-duty investigations, a majority of on-call investigations could be conducted by telephone and some required response to a death scene. Moreover, all other coroner responsibilities were sometimes conducted on-call: securing property, notifying relatives, arranging organ donations, releasing bodies, and performing other morgue responsibilities.

Deputies called hospitals and nursing homes, relatives, funeral homes and anyone else necessary to secure property and the body of the deceased. Although some offices could not be contacted outside the ordinary business day, most of the entities the deputies dealt with were also on a twenty-four hour a day schedule or else had to be contacted, regardless of the hour (e.g. relatives).

The court concludes that on-call investigations were substantially the same as on-duty investigations, with the exception that on-call investigations were usually handled from outside the Coroner's Office, most often the coroner's home, while on-duty investigations were handled from the Coroner's Office. Both on-duty investigations and on-call investigations were most often conducted by telephone.

**2) THE REQUIRED RESPONSE TIME—**

■ The response time within which an on-call employee must report back to work may so restrict an employee that the time spent on-call is for the benefit of the employer and therefor compensable. *Renfro v. Emporia*, 729 F.Supp. 747, 748–49 (D.Kansas 1990 [4]); Dept. of Labor, Wage and Hour Div., Ltr.Rul. No. 1695 (Nov. 15, 1988); Dept. of Labor, Wage and Hour Div., Ltr.Rul. (No Number Assigned) (March 11, 1987).

In the *Renfro* case, city firefighters, in addition to their on-duty schedule, also appeared on a mandatory callback list for each 24–hour period following a regularly scheduled tour of duty. During this on-call period, the firefighters were not required to remain on the stationhouse premises. However, they were required to carry pagers and return to work within twenty minutes if called or be subject to discipline. Firefighters were paid overtime only when they were actually called back to duty and not for the time spent on-call.

The Court of Appeals affirmed the District Court, holding that the required re-

---

**4.** The Tenth Circuit's decision in *Renfro v. Emporia* was officially reported during the course of this trial. Plaintiffs referred to this decision in their post-trial briefs. Some of the citations in the course of this memorandum decision refer to the earlier case in the District Court of Kansas.

sponse time of twenty minutes, combined with the frequency of calls, an average of 3–5 per twenty-four hour on-call shift, made it impossible for the firefighters to use their on-call time effectively for their own pursuits. Therefore, the on-call time was work time and should be compensated.

Defendants claim that the plaintiffs in this case have *no* required response time and therefore are not in the same position as the firefighters in *Renfro*.

The plaintiffs, however, claim that they are required to respond as soon as possible, and that Sheriff's Department policy is that "a deputy coroner shall be dispatched immediately" (Sheriff's Dept. Policy and Procedure Manual § 21.29 Pl.Ex. 1). In fact, they respond to Dispatch within fifteen minutes. This response is usually by telephone. Although Chief Deputy Coroner Siebe testified that there was never a specific response time for deputy coroners, the evidence was that the plaintiffs each responded as soon as possible to calls or pages from the dispatcher.

Both Oravetz and McAllister testified that Siebe specifically instructed them to respond to calls as soon as possible. Obviously, since most of the on-call death reports were initiated by a telephone call to the deputy's home by Dispatch, the telephone would have to be answered immediately in order to obtain the initial preliminary information. In this regard, the interruption was immediate.

When the contact was by pager, the testimony was again uniform that the deputies' normal practice was to telephone the dispatcher as soon as the deputy could get to a telephone. Under both circumstances, the normal practice of the deputies was then immediately to commence the necessary investigation.

Plaintiffs claim that the lack of any specific response time imparted no freedom to them. Responses were made as soon as possible and in the same manner as if the death report was received on duty.

The deputies testified that when they had to respond in person to the scene of a death, they responded as quickly as possible. They testified that they did so be-cause often emergency personnel, rescue squad, fire department or police, could only leave the scene and continue with other duties after the coroner had conducted his part of the investigation and authorized removal of the body. Delay in responding by the coroner could mean that a wrecked car would remain blocking a freeway until he could arrive and authorize the removal of the body from the wreck so the car could be removed.

The testimony was uniform that coroners responded as soon as possible, by telephone or in person, whichever was appropriate. There was no testimony that any coroner was ever disciplined for a delayed response.

This court concludes that the policy of the department was that calls by Dispatch be returned within fifteen minutes and that the coroner report to the scene of a death, if required, as soon as possible. There was no official required response time for reporting in person to a death scene and there was no testimony regarding discipline for any coroner who delayed in responding, either to Dispatch, or to the scene of a death. (Siebe testimony). The Court therefore finds that there was no explicit response time required for a coroner to report to the scene of a death, and there was no specific response time to initiate a telephone investigation of a coroner's case, only a fifteen minute time limit for responding to Dispatch when notified of a death. However, the actual practice in the Coroner's Office was that investigators initiate an investigation as soon as possible, except for nursing home deaths, which could be investigated the next on-duty shift.

### 3) THE FREQUENCY OF CALLS DURING ON-CALL HOURS—

■ The frequency of calls may so restrict an on-call employee that the time is spent for the employer's benefit and is therefore compensable. *Renfro v. Emporia*, 729 F.Supp. 747, 748, 751 (D.C.Kan. 1990), aff'd 948 F.2d 1529 (10th Cir.1991) certiorari dismissed, —— U.S. ——, 112 S.Ct. 1310, 117 L.Ed.2d 510 (1992); *Brock*

v. *El Paso Natural Gas Co.*, 826 F.2d 369, 373 (5th Cir.1987); *Clay v. Winona*, 753 F.Supp. 624, 629 (N.D.Miss.1990); Dept. of Labor, Wage and Hour Div., Ltr.Rul. No. 1695 (Nov. 15, 1988); Dept. of Labor, Wage and Hour Div., Ltr.Rul. No. 1693 (Sept. 8, 1988).

In the case of *Renfro v. Emporia*, the appellate court affirmed the finding of the lower court that the calls were frequent enough that on-call time *was* compensable. The Court found that, although some firefighters had secondary employment and pursued some personal activities, for most firefighters, secondary employment and personal activities were difficult, if not impossible. *Id.* at 1535.

Firefighters testified that on occasion a firefighter must answer 12–13 calls in one day and that on the average, on-call firefighters receive 3–5 calls per twenty-four hour on-call shift (729 F.Supp. at 751).

The employer contended that firefighters had traded their on-call time with other firefighters and that while on-call firefighters had participated in sports activities, socialized with friends and relatives, attended business meetings, gone shopping, gone out to eat, babysitted and performed maintenance or other activities around their homes.

Nevertheless, the District Court held, and the Court of Appeals affirmed, that the firefighters' on-call time was compensable under the FLSA. The Court of Appeals noted that the District Court had found two important distinctions in the firefighters' on-call duties: the frequency of callbacks, and required response time. They were called back to the station an average of 3–5 times per on-call shift, and they were required to report to the stationhouse within twenty minutes of the call, alert and ready to protect the community. If they were late or missed a callback, they were subject to discipline, which might ultimately result in termination. 948 F.2d at 1531.

The Court held that the firefighters' on-call time was so restricted by their employer that they were "engaged to wait" and therefore entitled to compensation for it under the FLSA. *Id.* at 1538.

In the case of *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369 (5th Cir.1987), calls were so *infrequent* that the court determined that on-call hours were not "hours worked" under the FLSA, and therefore not compensable. Plaintiffs were employees of a natural gas pipeline company, employed at satellite stations along the pipeline route. One employee was on-call for each after-hours shift, to protect against vandalism and theft. Each employee's home was equipped with an alarm which sounded if there was trouble at the satellite station. The testimony was that the employees were seldom called and that the required response time was not unduly restrictive.

In the case of *Clay v. Winona*, 753 F.Supp. 624 (N.D.Miss.1990), the frequency of calls was also less than that required to make on-call time compensable. Plaintiffs were firefighters who sued to recover overtime pay for standby shifts. The District Court granted summary judgment to the employer, finding that the firefighters were not entitled to overtime for standby shifts: they could use standby time for their own purposes, they were aware that they would not be paid for standby duty when they were hired, and they were called back less than once per twenty-four hour standby shift, even though there was a five minute response time requirement.

Plaintiffs believe their circumstances to be similar to the firefighters' in *Renfro*. Crucial factors were frequency of callbacks and response time—3–5 per on-call period, with a twenty minute time limit to report back to the firehouse.

During the periods covered by this action, deaths were reported on a range from once every 3.82 hours (1988) to once every 8.33 hours (1989).

Defendants seek to emphasize that the occasions on which an on-call deputy is required to leave his residence to respond to a death scene are infrequent. Plaintiffs claim that this argument misses the point for two reasons. First, regardless of the frequency of on-site investigations, the on-call deputy must be available and prepared

to respond. Second, the fact that most investigations are conducted by telephone is of only minor relevance. The evidence was undisputed that on-call deputies are frequently interrupted, which is the significant inquiry. In this regard, a majority of *all* investigations conducted by the Coroner's Office are done by telephone, rather than by responding to a death scene. The investigations are no less important or significant simply because they are conducted by telephone. *On-duty* investigations are also most often conducted by telephone, albeit at the Coroner's Office, not the deputy's home.

Defendants specify that the vast majority of responses require making one or more phone calls and that the response time requirement here is much less restrictive than in other cases. The frequency of calls to a coroner investigator was established at 1–2 per every 8 hours of on-call time. During one two-year period the rate rose to once every 3–4 hours, when coroners were required to initiate immediate investigation of deaths of patients in nursing homes. When the Coroner's Office changed its policy to allow those deaths to be investigated the next on-duty shift, the rate fell for a time to one death per 8 hours on-call.

The frequency of occasions when a coroner investigator is required to respond back to a death scene was established at various levels of frequency: 1) once every 75 hours, or approximately once every ten shifts. 2) When Chief Deputy Coroner Siebe included instances where the initial response was made during a regular duty shift but the response required the coroner investigator to remain at the scene into his on-call shift, the frequency was once every 59 hours for 1990. (Siebe testimony). These are the most recent statistics. 3) In earlier reports Siebe has estimated the in-person response rate to be as often as once in 17 hours on-call.

Since defendants kept the statistics, this court adopts the statistics most favorable to plaintiffs.

This court concludes that the average frequency of calls requiring a coroner to respond by telephone while on-call was one per 4 hours on-call. The average frequency of calls requiring an in-person response by the on-call coroner was one per 17 hours on-call.

The plaintiffs in *Renfro* were on-call for twenty-four hours at a time, during which they were called back to the stationhouse an average of 3–5 times. If we triple the numbers of calls for the coroners' eight-hour on-call shifts, and compare them to the firefighters in *Renfro*, we see that the coroners, in twenty-four hours on-call, would initiate 3–6 telephone investigations and one and one-half in-person investigations.

Defendants would argue that the plaintiffs in *Renfro* were required to respond *in person* to a call, where the plaintiffs in this case usually respond by telephone. This argument misses the point. The majority of *on-duty* investigations are also conducted by telephone. When an investigator made telephone calls from his home to investigate a death, he was doing exactly the same work he would have been doing if he were on-duty in the Coroner's Office.

Comparing the numbers of responses, we see that the firefighters in *Renfro* responded 3–5 times per twenty-four hours and the coroners in this case in an average twenty-four hours on-call, were called to work to initiate a telephone investigation 3–6 times, and an in-person investigation one and one-half times. This is equivalent to the frequency of responses in the *Renfro* case.

4) THE NUMBER AND FREQUENCY OF MISCELLANEOUS WORK–RELATED CALLS THEY RECEIVE WHICH ARE NOT REFLECTED IN THE CORONER'S OFFICE STATISTICS

The official statistics may not reflect the actual number of calls made or received by the coroner investigators, therefore the number of interruptions may be greater.

Plaintiffs assert that the defendants' statistics are not accurate reflections of *interruptions*. It was undisputed that the plaintiffs did not record every work-related telephone call received while on call nor did

they seek overtime for each call. The testimony was uncontradicted that, in general, calls were recorded and overtime sought only when an investigation was commenced and a death file was opened. On-call telephone inquiries from hospitals, police, co-workers, the media and the removal service are not recorded, and are not reflected in the statistics, but nonetheless constitute interruptions to the on-call deputy coroner.

Plaintiffs disagree with defendants' interpretation of the Coroner's Office statistics on calls. Plaintiffs say they only "charge" the County for the first call which initiates a death investigation. Plaintiffs say that each call for which they charge the County also represents additional calls connected with the same investigation, for which they do not charge. Plaintiffs' Berry and McAllister's records for their County-provided work telephones show many on-call, work-related telephone calls. McAllister was on call during November 1989 through January 1990 on 17 occasions. During this period he initiated 45 investigations. His telephone records from the period indicate that he initiated *244* work-related telephone calls from his home telephone. (Pl.Ex. 29). During the same period, Berry was on call on 46 occasions. His telephone records indicate that during this period he initiated *379* work-related telephone calls from his residence. (Pl.Ex. 30). As another example, in April, 1988, Berry was on call during 22 days and initiated 68 death investigations. During the same period he made approximately *254* telephone calls from his home. Obviously, the number of telephone calls is far greater than the number of investigations initiated. Also, the telephone bill reflects only outgoing calls, not incoming calls. Plaintiffs say that the total number of calls gives a truer picture of the number of *interruptions*, and that the interruptions make it difficult or impossible for the coroners to use their on-call time for personal pursuits.

Plaintiffs also claim that the average figures do not give a true picture of the conditions under which the coroners worked. Death is unpredictable and the coroners never knew at what hour of the day or night a death would be reported to them. They would immediately initiate an investigation. The statistics also demonstrate the hazard of relying on "averages" as an indicator of interruptions. All of the plaintiffs' statistics indicate that during some on-call periods, they received numerous calls, and that on others they received none. Nonetheless, when a call would be received was unpredictable, and in order to perform his job in a professional manner, the deputy coroner had to be prepared and available to respond to any situation, whether it be multiple calls or no calls. At a minimum, however, even defendants' statistics demonstrate that the deputies knew it was statistically likely they would receive a death report at least once during an on-call period.

The Court concludes that the plaintiffs made and received telephone calls for which they did not charge the County, as reflected in the telephone bills for the County telephone lines installed in plaintiffs' homes.

Few cases deal separately with the issue of interruptions of an employee's normal routine during on-call time, as distinct from the issue of frequency of calls.

In one such case, plaintiffs contended that interruptions by telephone and other kinds of calls were so often throughout the day and night as to seriously affect the employees' health. *Glenn v. Southern Cal. Edison Co.*, 187 F.2d 318 (9th Cir. 1951).

The plaintiffs in this case also claim that they do not sleep well, because of actual or anticipated interruptions. One coroner testified that he wakes up during the night to check the phone to be sure it is working. (McAllister testimony). Coroners also testified that days and nights on-call go by with no interruptions at all. They claim that this very unpredictability prevents them from using their on-call time for their own purposes.

The plaintiffs have established, by their telephone records, that they initiated many more telephone calls than they charged to the County, and that the number of inter-

ruptions was greater than the number of death investigations initiated. The number of phone calls made and received by the deputies does not change the statistics on the number of times they were "called back" to work. The number of interruptions does, however, have an effect on their ability to use their time for their own pursuits.

### 5) USE OF A PAGER

■ Use of an electronic pager may lessen restrictions on an on-call employee by making it possible for the employee to be away from a telephone or two-way radio, therefore making his on-call time non-compensable. 5 C.F.R. § 551.431(b)(1) (1989). *See, e.g. Norton v. Worthen Van Service, Inc.,* 839 F.2d 653, 654 (10th Cir.1988).

The plaintiffs in *Norton* were van drivers who transported railroad crews to and from their trains. The drivers generally worked shifts of eight to twelve hours a day and during that time they were required to be near enough to the employer's premises to be able to respond to calls within fifteen to twenty minutes. The drivers were, however, compensated for this waiting time if they received a call within two hours of their last call. This scheme was held to comply with the provisions of the FLSA and the drivers' on-call time was not compensable. *Id.*

Plaintiffs here complained that the pagers were not always reliable in all areas of the County. Thus, McAllister testified that he could not be reached at all in the vicinity of Bodega Bay, where he lives, and Berry testified that he could not be reached in the area of Calistoga, where he lives. However, this is contrary to Siebe's testimony that he was paged at the golf course in Bodega Bay and that he has paged the new coroner investigator, Iverson, at a golf course near Middletown, which is well beyond Calistoga, in neighboring Lake County, where Iverson lives. Moreover, Undersheriff Moore, who wears a pager 24 hours per day, testified that the only time he has had a problem being paged is when he forgets to turn it on. In any event, if there are isolated canyons or areas where the pagers do not work, defendants contend that the coroner investigators should be able to identify those areas and adjust accordingly, presumably by using the two-way radios in their County vehicles or by staying close to a telephone.

Plaintiffs claim that they in effect did not have the benefit of wearing pagers because the pagers were not reliable. Each plaintiff as well as former Chief Deputy Coroner Dunham and Chief Deputy Coroner Siebe acknowledge that the pagers were not reliable. Siebe admitted that problems existed with the paging system in downtown Santa Rosa, on the coast, and in the hill area. Neither McAllister nor Berry could be paged at their own homes. Marcus refused to rely on the paging system because he did not trust it.

Under these circumstances, any freedom imparted to the deputies by the pagers was illusory, according to plaintiffs. If anything, the unreliable paging system caused the deputies to be *more* restricted in that to remain available, they had to be close to a telephone or coroner vehicle radio, and needed to inform Dispatch whenever they moved to a different location. The unreliability of the paging system is another factor in plaintiffs' favor.

This court concludes that the pagers were not 100% reliable and so their benefit, if any, to plaintiffs was only partial.

### 6) GEOGRAPHICAL RESTRICTIONS ON EMPLOYEES' MOVEMENTS

■ Most courts do not find that geographical restrictions alone render an employee's on-call time compensable. Such restrictions may, combined with other factors, such as frequency of calls and required response time, restrict an employee's ability to use on-call time for personal pursuits, and therefore make on-call time compensable.

For example, the employees in the *Rousseau* case were restricted to a barge, whether offshore, or docked, and could not leave during their on-call time. Nevertheless, the court held that because of other factors, their on-call time was not compensable. The other factors included infre-

quency of calls and the ability to trade on-call duties with other employees. *Rousseau v. Teledyne Movible Offshore, Inc.,* 805 F.2d 1245, 1248 (5th Cir.1986).

If an on-call employee is restricted to a certain geographic area, due to required response time and/or frequency of calls, then his time may be so restricted that it is compensable. 729 F.Supp. at 748–49.

In *Renfro,* where firefighters on-call time was found to be compensable, firefighters testified that due to the twenty minute response time requirement and the large number of callbacks they could not go out of town. *Id.*

Defendants claim that deputy coroners could and did leave Sonoma County while on-call. In fact, former coroner Berry lives on the County border, as he did while still a coroner and non-plaintiff coroner Iverson lives in neighboring Lake County. Only plaintiff Marcus lives within the central County area, the others living 45 minutes or more distant. Chief Deputy Coroner Siebe testified that any coroner could leave the County while on-call with permission.

Plaintiffs in this case claim that they were restricted to Sonoma County (1600 square miles) and could only go to other counties with permission. Marcus was instructed to remain in the central county area. The deputy coroners testified that they normally remained at home while on call.

Except in unusual circumstances, the plaintiffs avoided travel while on-call because of their understanding that family members were prohibited from being in the coroner's vehicle, and the consequent need to take two vehicles for any kind of travel with the family, so as not to strand a family member if called to a death scene.

Although travel was not prohibited within the county, it was avoided because it could unnecessarily delay a response (e.g. Marcus testimony); because the pagers did not work in all areas of the county (testimony of all plaintiffs); and because it was inconvenient to respond to calls and conduct a professional investigation from a phone booth or other location (e.g. Oravetz testimony).

In this regard, the ability to travel throughout the county, say the plaintiffs, was an illusory benefit. The evidence was that the on-call deputy rarely did so because of the inconvenience or possibility of being less available or delaying a response.

The deputies were not required to respond to the scene of a death within any definite time, and there was no record of any deputy ever being disciplined for responding too slowly. The only definite response requirement was a telephone call to Dispatch within fifteen minutes of notification of a death. However, the practice of the coroner investigators was to initiate an investigation immediately upon being notified of a death by Dispatch.

This court concludes that plaintiffs were specifically restricted to a very large area (Sonoma County), and that they were allowed to wear pagers which were not reliable in all areas of the County, including the areas near two of the plaintiffs' homes. They were required to respond by telephone within fifteen minutes of a call from Dispatch and they were to initiate their investigation as soon as possible. This required them to be within fifteen or twenty minutes of a telephone or two-way radio, which each plaintiff had in his County vehicle. This court concludes that the geographic restriction was only partial, in that plaintiffs could seldom if ever go into a neighboring County while on-call, due to the frequency of responses and the required response time.

7) THE EASE WITH WHICH ON–CALL EMPLOYEES CAN TRADE ON–CALL RESPONSIBILITIES—

█ If employees may easily trade on-call responsibilities, then they have more flexibility in using their off-duty time for personal pursuits which would be difficult or impossible to pursue on-call. If employees may be relieved of on-call responsibilities at their request, whether by trading with other employees or otherwise, then on-call time is less likely to be compensable. 5 C.F.R. § 551.431(b)(2) (1989); *Brock,* 826 F.2d at 373.

The employee-plaintiffs in the case of *Brock v. El Paso Natural Gas,* 826 F.2d 369 (5th Cir.1987) worked at 22 satellite pumping stations along an interstate natural gas pipeline system. These stations were located in isolated areas, with the employees' family homes located at the employment site. Each home had an alarm system connected to the satellite station. Each employee worked a regularly scheduled 40–hour week. Company policy was to have one employee "on-call" from 4:00 p.m. to 7:30 a.m. each night to prevent vandalism and theft. If problems arose at the station, the alarm would sound in the home of the "on-call" employee, who would be obligated to investigate and correct the problem.

The Court of Appeals reversed a District Court holding that the employees' on-call time was compensable. One of the reasons was the ease with which employees could trade on-call time. They had absolute flexibility and could divest themselves of on-call responsibilities by trading with another employee or requesting that the company relieve them. *Id.* at 373. The court also noted that alarms were infrequent.

Defendants claim that it is easy for the coroners to trade on-call shifts. According to defendants, the evidence established that coroner investigators are able to have one of the other coroner investigators or the Chief Deputy Coroner cover for them if they choose not to be available during all or part of an on-call shift.

The plaintiffs claim that this ease is purely theoretical. Since there are so few coroners, they have little if any flexibility in trading their on-call time. Although the three deputies could arrange among themselves to "cover" for each other, the evidence was also uncontradicted that such trades were reserved for special occasions, and that it was much more common for the deputies to work their usual schedules and plan their personal activities around them. Because off-duty time was so valuable, the deputies were reluctant to seek trades except in important circumstances, because of their unwillingness to impose on each other's off-duty time. For example, a deputy might trade call in order to attend a child's school graduation, or for a few hours while teaching a class. (Berry testimony).

There was conflicting testimony regarding plaintiff Berry and how he managed to teach for a number of semesters at a local community college. The hours of the class were typically on two consecutive evenings, when Berry was on-call. If Berry was able to use his on-call time to teach a class, then that tends to show that the coroners could use their on-call time for personal pursuits. If he was able to have another coroner cover for him, then that tends to show that the coroners could trade on-call time. Either way, Berry's teaching a class during his on-call shifts tends to undermine plaintiffs' position.

Although Chief Deputy Coroner Siebe testified that he was available to take on-call duty, the plaintiffs testified that they had seldom if ever requested this.

This court concludes that, in actual practice, the deputies seldom voluntarily traded on-call shifts, but were likely to be drafted to cover for another deputy who was absent due to illness, vacation, training or military service. Some coroners seemed to be more enterprising or more ingenious than others in arranging their schedules around their personal or business pursuits. Practically speaking, with so few coroners, there was little to be gained by trading on-call time.

8) WHETHER THEY MAY TRANSPORT FAMILY MEMBERS IN THEIR COUNTY VEHICLES, OR WHETHER FAMILY MEMBERS MUST TRAVEL IN SEPARATE CARS

If the plaintiffs could not have family members in their county vehicles, which they were required to use while on-call, that would tend to limit their ability to socialize with their families.[5] This would make their on-call time more likely to be compensable.

---

**5.** The County vehicles were minivans, each having two seats (driver and one passenger), the deputy's equipment for on-scene investigations, and room to transport a body, if necessary.

Plaintiffs claim it was Sheriff's Department policy and actual practice that family members not be transported in the County vehicle. Chief Deputy Coroner Siebe published a memorandum in October, 1988 (Pl. Ex. 35) stating:

I would like to clarify a question that has come up about the use of County vehicles. The Coroner's vehicles are assigned to Investigators on a temporary basis only. Due to your on-call status, you will retain control of the vehicle on a 24-hour basis. You will follow the rules set forth in the Policy & Procedure Manual, specifically, *"Citizens will not be transported in departmental vehicles unless necessary to accomplish a departmental purpose."* You will be responsible for the cleanliness and maintenance of the vehicles. *The vehicles will not be used for any personal business.* (Emphasis supplied)

The memorandum was issued in response to an incident in which Marcus was in a fender-bender in a coroner vehicle with his wife as a passenger. (Marcus testimony, Dunham testimony).

Plaintiffs testified that they did not transport family members in their County vehicles and that when they had asked permission to do so, it was denied. (Oravetz testimony).

Defendants said that the actual practice of the Sheriff's Department was to allow family members to be transported in County vehicles. Siebe testified that he permitted deputies to transport family members in their County vehicles, while on-call. This is contrary to written County policy, as stated in Siebe's own memo. The reason that Oravetz was denied permission to allow his wife to accompany him to San Francisco in the County vehicle was that McAllister was *off-duty* at the time. Undersheriff Moore testified that no civilians were permitted in County vehicles unless for a work-related purpose.

This court finds that the written policy of the Sheriff's Office was that civilians not be transported in County vehicles, unless it achieved an official purpose.

## 9) EXTENT OF PERSONAL ACTIVITIES ENGAGED IN DURING ON–CALL TIME—

On-call time may be compensable work time within the meaning of the FLSA. During the time an employee is on-call, he may be on duty when his responsibility is to be prepared immediately to respond to a call under the conditions established by his employer. The standard for determining the compensability of on-call time has been broadly phrased. Federal regulations summarize Supreme Court ruling as follows:

29 C.F.R. § 785.7 Judicial construction

The United States Supreme Court originally stated that employees subject to the act must be paid for all time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer or his business. *Tennessee C. I. & R. Co. v. Muscoda,* 321 U.S. 590 [64 S.Ct. 698, 88 L.Ed. 949] (1944).[6]

Subsequently the Court ruled that there need be no exertion at all and that all hours are hours worked which the employee is required to give his employer, that "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a standby capacity. Readiness to serve may be hired, quite as much as service itself, the time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer." *Armour & Co. v. Wantock,* 323 U.S. 126 [65 S.Ct. 165, 89 L.Ed. 118] (1944); *Skidmore v. Swift & Co.,* 323 U.S. 134 [65 S.Ct. 161, 89 L.Ed. 124] (1944).

■ The most significant test in determining whether an employee's time spent on-call is compensable or not is whether he

---

**6.** The Ninth Circuit noted that such a case required detailed and specific findings *Wailua* *Agr. Co. v. Maneja* 178 F.2d 603, 607 (9th Cir. 1949).

is engaged to wait or waiting to be engaged. If the employee cannot effectively use on-call time for personal pursuits, then the employee is engaged to wait and on-call time is compensable.

Since the FLSA became applicable to public agencies, there has been little appellate court guidance on the compensability of public employees' on-call time. In one case, the Court of Appeals affirmed the lower court's finding that firefighters' on-call time was compensable under the FLSA. The critical factors were the frequency of calls and the required response time. Because of these two factors, firefighters could not use their on-call time for personal pursuits. In one twenty-four hour on-call shift, firefighters received an average of 3–5 calls to return to the firehouse ready to fight a fire within twenty minutes of the call. Firefighters who were late or missed a callback were subject to discipline.[7] Firefighters were paid overtime for on-call time only when actually called back to work. Firefighters who were called back to work were paid a minimum of one hour overtime. The firefighters filed suit for compensation and other relief under the FLSA. In their complaint the firefighters alleged that they were unable effectively to use their on-call time for personal activities; the on-call duty was time spent working in excess of the hourly levels set forth in FLSA and therefore compensable under FLSA; and, furthermore, their employer's actions and omissions showed bad faith. 948 F.2d at 1531.

The lower court found, and the Court of Appeals agreed, that it was difficult if not impossible for firefighters to hold secondary employment or trade on-call time, when they had to respond to 3–5 calls per shift within twenty minutes, or face discipline.

Plaintiffs believe their situation to be comparable to the firefighters' in *Renfro.*

Coroner investigators normally worked four ten-hour on-duty shifts. Most often, their on-call shifts immediately followed each on-duty shift. Typically a coroner investigator would work ten hours on-duty, eight hours on-call, then repeat, until the four ten hour on-duty shifts were completed. The coroner investigator would then have three full days totally off, no on-duty time and no on-call time.

Defendants' witnesses testified that coroner investigators had some flexibility in setting their on-call schedule, choosing in some instances to be on-call on weekends, or to increase their on-call hours. Plaintiffs disagreed, claiming that their on-call schedules were assigned to them with no choice on their part. (Berry testimony).

Plaintiffs testified that they seldom traded on-call shifts, partly because, with only three coroners on staff at any one time, there was limited flexibility. Trades were usually reserved for special occasions or necessity, as when a coroner was sick or on vacation. Plaintiff Berry apparently traded call to arrange coverage while he taught classes at a community college.

Plaintiffs claimed that their on-call time was spent waiting for the unpredictable interruptions which they knew were coming. They had to be prepared to respond quickly, and in person if necessary, to be ready to deal with bereaved relatives, emergency personnel and homicide investigators, where necessary.

The deputy coroners testified uniformly that their personal activities were restricted while on-call. For example, the deputies did not engage in hobbies which would require them to leave the county (e.g. fishing, hunting, camping, visiting friends and relatives, attending events, attending activities connected with their children's out-of-county schools or sporting events).

They did not engage in activities which they did not want to be interrupted (movies, dining out, shopping, labor-intensive tasks, and entertaining at home.)

They did not engage in activities which would make them dirty and possible delay

---

**7.** Firefighters who were late in responding or missed a callback received a "white slip," a form of discipline which was considered in employee evaluations and which may result in disciplinary action, including possible termination, if four or more white slips are received in a four-month period.

a response (vehicle maintenance, gardening, household chores and maintenance, in-county hunting).

They refrained from activities which rendered them inaccessible by pager (walks on beach at Bodega Bay, activities near Berry home in "hill" area of Sonoma).

Additionally, they generally refrained from consuming alcohol, in order to maintain a professional demeanor when dealing with the public.

Attempts at social events or travel in Sonoma County was further restricted in that separate vehicles were used so that the spouse or family would not be without transportation if the deputy was called out to a death scene; and to comply with the deputy coroner's understanding that family members could not properly be in the coroner vehicle.

Defendants claimed that the plaintiffs could indulge in many personal pursuits, since they had to investigate a death only an average of once or twice during each eight-hour on-call shift and this investigation was almost always conducted by telephone. Only once in 60–75 hours on-call, say defendants, would the coroner actually have to respond in-person to a death scene. Some earlier statistics showed in-person investigations to be necessary once per seventeen hours on-call or every two eight-hour shifts.

According to defendants, Plaintiffs here are freer [than plaintiffs in other cases] to engage in personal pursuits than all these other employees because of the comparative lack of restrictions. Moreover, given that the vast majority of on-call time is in the late night and early morning hours, plaintiffs cannot be said to be practically precluded from any of the activities that they described, such as travelling to San Francisco, fishing, hiking, etc., since such activities are not ordinarily undertaken between midnight and 7:00 a.m. If, at other times, coroner investigators simply "sit by the phone and wait for it to ring," as claimed, it is not because they are explicitly or effectively required to do so. They are given latitude and discretion to use the time as they please.

In fact, deputy coroners have been able to have other employment or businesses while on-call. Plaintiff Berry taught classes at a local community college and answered calls for a volunteer fire department of which he was Battalion Chief, while on-call. Siebe, when he was a deputy coroner, had a firewood business and a machine shop business. Siebe also testified that he attended his children's sports events while on-call.

However, as in *Renfro*, the fact that one or two employees were able to have secondary employment does not mean that such employment was not difficult or even impossible under the circumstances 948 F.2d at 1535. Berry and Siebe were the only coroners who claimed to have had secondary employment. Dunham, Marcus, McAllister and Oravetz all testified that the coroners could not and did not have secondary employment while on-call.

Coroner investigators could sleep, read, watch television, do some household chores, go out to dinner or a movie, while on-call. They were not required to respond in person to a call within any time limit and most of their on-call responsibilities could be handled by telephone, so there was no "time-limit leash" restricting their movements.

They did not engage in activities which would make it difficult for them to respond promptly to a call. They did not pursue social activities with their families while on call, both because of the restriction on having family members in their County vehicles and because they could be interrupted. They limited their consumption of alcohol to the extent that they wanted to present a sober image if they had contact with the public. For the same reason they refrained from strenuous or dirty activities like yard work or car maintenance while on-call, in order to be presentable to the public in case they would have to report in person to a death scene.

Deputies made and received more telephone calls than they logged and charged to the County, and these interruptions were

unpredictable and often disturbed their sleep.

While on-call they remained in a state of readiness to work; they were engaged to wait. *See 29 C.F.R. Section 553.221(d) (1989).*

### 10) THE EXISTENCE AND PROVISIONS OF ANY AGREEMENT BETWEEN THE PARTIES GOVERNING ON–CALL WORK

■ The parties' agreement to these conditions of employment is one factor to consider in determining whether working conditions comply with the FLSA. *See, e.g.* 826 F.2d at 374; 805 F.2d at 1248; *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507 (9th Cir.1978).

In the case of *Rousseau,* the employees were required to spend seven full days at a time working and living on a barge. Although the employees could not leave the barge during the seven day stretches, they received compensation only for time spent in the act of labor. 805 F.2d at 1247.

Even though the employees were restricted to the barge, the court denied plaintiffs' claims that they should be compensated for all hours spent on-call, emphasizing that the parties had entered into an agreement otherwise. "The district court found that Teledyne and the employees operated under an agreement that the employees would only receive compensation for hours spent in physical labor ... *Although the existence of an agreement may not be controlling in all cases, it is usually relevant to the compensability issue." Id.*

The court supported the district court's finding of an agreement between Teledyne and the employees. Representatives of Teledyne testified to informing the employees of the policy at various times. Indeed, many of the employees who testified admitted at least some awareness of the policy.

Of course, it is clear that the employees did not like the no leave rule. But their dislike does not negate the existence of an agreement. As the district court points out, *continuance of employment can be evidence of an implied agreement to the terms of that employment.* [Citation.] *Id.* at 1248 (emphasis added).

Defendants distinguish the case of *Tennessee C. I. & R. Co. v. Muscoda,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed.2d 949 (1944) and *Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America,* 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945), where employers were ordered to compensate employees for travel time underground, from *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) and *Armour & Co. v. Wantock,* 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), where employers were ordered to pay employees for stand-by time.

The Supreme Court, in both *Jewell Ridge* and *Tennessee Coal,* went to great lengths to distinguish the facts—no conclusive agreement and definitive regulations and statutes mandating that underground travel time be compensated—from those present in the two "waiting time" or "on-call" cases, namely *Skidmore v. Swift & Co.,* and *Armour and Co. v. Wantock.*

Defendants claim that the plaintiffs agreed to the terms of their on-call compensation: 5 per cent premium pay and hourly overtime minimums for any work actually performed while on-call. This agreement was reached by the process of collective bargaining between the County and the Sheriff's Department Employees' Association.[8]

Prior to 1982, coroners were paid 5% of their hourly pay for each hour on-call. This was apparently a "bookkeeping nightmare" and thereafter the coroners received a 5% overall increase and hourly minimums for time spent investigating a case. (McAllister and Berry testimony, Def. Ex. A, Court Ex. 2).

It is undisputed that each plaintiff understood the requirements of the job before he applied for and accepted the position. Until filing suit, say defendants, plaintiffs did not complain about the on-call require-

---

**8.** All of the plaintiffs except McAllister were members.

ments; indeed, the more senior members chose shifts with the most on-call time.

Defendants argue that public policy reasons mandate that the parties' agreement be considered, and indeed should be controlling if reasonable. Here, for over three years, coroner investigators, as well as other employees within the Sheriff's Department, accepted various forms of compensation for their on-call time, pursuant to negotiated collective bargaining agreements. Plaintiffs should not now be permitted to "renegotiate" their agreements, thus throwing the budget process into a state of chaos.

Plaintiffs claim that it is against public policy for parties to contract away their rights under the FLSA and that in fact such agreements are unenforceable. Plaintiffs contend that the Supreme Court has determined that the FLSA invalidates and supersedes any inconsistent provision in a collective bargaining agreement.

For example, the Supreme Court considered the compensability under the FLSA of certain travel time by miners. The employer argued against compensability based on past practice and contract. The Supreme Court rejected the argument:

> But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the work week or not to compensate employees for certain portions of their work. The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him only for a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights. (Citation and footnote omitted) 321 U.S. at 602–03, 64 S.Ct. at 705).

The same principal has been followed by the Ninth Circuit. In *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507 (9th Cir.1978) the court considered the effect of a collective bargaining agreement on a claim for overtime under the FLSA, and rejected an employer defense that the FLSA claim had been waived by virtue of the provisions of a collective bargaining agreement:

> The only remaining defense by Inflight is that the Union and a substantial number of employees waived the contract provisions pertaining to overtime wages. This contention must be rejected. Assuming that officials of the Union and some of its members could waive or modify the written terms of the collective bargaining agreement by their conduct, a proposition upon which we expressly decline to rule, the agreement cannot be altered in a manner which would violate public policy as expressed by the Fair Labor Standards Act. *See Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590 [64 S.Ct. 698, 88 L.Ed.2d 949] (1944). *Id.* at 513.

Plaintiffs claim that the Coroner's Bureau is a very small group within a very large bargaining unit—all the members of the Sonoma County Sheriff's Employees Association. Furthermore, few of the other employees have on-call responsibilities. The coroners claim that their rights were bargained away in the face of the larger group's interests. They dispute that the 5% premium represents compensation for being on-call and characterize it as "specialist pay," for their expertise as investigators.

No provision of any of the Memorandums of Understanding specifically stated that the 5 percent detective premium given to the deputy coroners was meant to compensate them for on-call activities. Defendants' witnesses testified inconsistently whether the 5% premium was detective pay or compensation for having an on-call obligation. (Siebe testimony). In fact, every single Memorandum of Understanding between the County and the Sheriff's Department Employees' Association from 1980 through 1992 treated premium pay sepa-

rately from both overtime pay and callback pay.

The evidence was strong that premium pay represented compensation for expertise, not for being on-call. The others receiving premium compensation (sometimes referred to as specialist premium or special assignment premium) included: Special Weapons and Tactics (S.W.A.T.), Bomb Disposal, Field Training Officer, Dog Handler, and Helicopter pilot. These are all categories of Sheriff's Department personnel having special training and abilities.

Plaintiffs and their witnesses testified to the special expertise required of a deputy coroner. He is often the first on the scene of a suspicious death. He must preserve evidence for other investigators, in the case of suspected homicide, child abuse, drug overdose, accident or other death where the evidence may be used in criminal proceedings. He must also be prepared to refer family members for appropriate social services and arrange for securing of property and disposition of the body of the deceased.

Plaintiffs also dispute allegations that the deputies never complained about being required to be on-call. In fact, plaintiffs Berry and Marcus on July 18, 1988 filed an "Employee Hazard Report" complaining about "inadequate personnel in unit to handle extensive workload," and specifically citing excessive on-call time as a hazard. Berry and Marcus sought increased staffing as a remedy for the problem.

This court finds that the parties did have an agreement regarding compensation for work done during on-call shifts. The agreement included a two-hour minimum, later reduced to a one-hour minimum, at one and one-half times the deputy's regular hourly pay, for telephone investigations and a two-hour minimum, at the same rate, if the deputy were actually called to a death scene, regardless of the actual time spent. The court finds that there was no clear agreement as to the 5 percent premium and that there was no written provision of the Memorandum of Understanding specifying that this 5 percent premium was in fact compensation for being on-call. The court finds that the 5 percent premium was not part of the parties' agreement regarding on-call compensation.

The Court rejects defendants' argument that public policy mandates that the existing contractual arrangements between the County and the deputy coroners be accepted as controlling in this matter. The Court further rejects defendants' implication that for the Court to rule otherwise would be tantamount to permitting the plaintiffs to "renegotiate" their agreement, and would throw the budget process into chaos. Simply put, the mandate and legal requirements of the FLSA must be implemented in this matter now. Plaintiffs should not be forever indentured by reason of past budget constraints, nor foreclosed from rightfully claiming their entitled compensation because of "doomsday" predictions of budgetary chaos. The Court is not the forum to seek a political moratorium or an exception from implementing the mandate of the FLSA. The defendants should look to the proper political forum.[9]

## 11) DEFENDANTS' WILFULNESS OR BAD FAITH IN VIOLATING FLSA

■ If defendants acted wilfully or in bad faith in violating the FLSA, then the applicable statute of limitations is three

---

9. Particularly noteworthy is the testimony of the former Chief Deputy Coroner, Wayne Dunham, and the present Undersheriff, Dale Moore. Dunham testified that for several fiscal years prior to his retirement in 1988, he had submitted budget requests for one additional deputy coroner. This additional deputy would have permitted the Coroner's Bureau to implement a "fireman's shift," a schedule for each deputy of twenty-four hours on-duty and twenty-four hours off-duty. It has been suggested that such an arrangement might have prevented the conditions which led to this lawsuit.

Moore testified that in 1988 he recommended to the Sheriff that the budget include provisions for a fourth deputy coroner, and that the Board of Supervisors approved this provision. The position was not filled because Dunham retired and Siebe became Chief Deputy Coroner. Siebe changed the policy on response time to deaths in convalescent homes to require a response the next on-duty shift, rather than immediately. This reduced the statistics on number of on-call responses by the deputies.

years, rather than two years, and plaintiffs are entitled to liquidated damages, equal to the amount of compensatory damages. 29 U.S.C. § 255(a), § 216(b).

The test proposed by defendants for determining whether liquidated damages should be awarded, in an instance of noncompliance with the FLSA, is prescribed in 29 U.S.C. § 260, which provides, in pertinent part:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act.

29 U.S.C. § 260.

Pursuant to § 260, if the employer establishes that the alleged violation of the FLSA was in good faith and that he or she had reasonable grounds for believing that no violation took place, liquidated damages should not be awarded since they are primarily designed to compensate for concealed violations of the FLSA. *See, Equal Employment Opportunity Commission v. First Citizens Bank,* 758 F.2d 397, 403 (9th Cir.1985), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985).

The employer satisfied the "good faith" component of the test if it proves that it had "an honest intention to ascertain what [the FLSA] requires" and an honest intention to "act in accordance with it." *Brock v. Shirk,* 833 F.2d 1326, 1330 (9th Cir.1987), vacated on other grounds, 488 U.S. 806, 109 S.Ct. 38, 102 L.Ed.2d 18 (1988); *see, also, Bratt v. County of Los Angeles,* 912 F.2d 1066, 1072 (9th Cir.1990). Such "honest intentions" are established if it is shown that the employer's decision not to compensate employees for certain overtime is made "above board" and "justified in public" 912 F.2d at 1072. As pointed out in *Bratt,* liquidated damages are generally only awarded where there has been some concealment of the law from employees or an attempt to avoid the law by using "ticky-tack" defenses. *Id.*

In addition to the "good faith" test, pursuant to Section 260, the employer must establish that he has reasonable grounds for believing that his conduct complied with the Act. *Id.* at 1072. Thus, where, as in *Bratt,* there is no clear-cut violation of the applicable regulations, or the regulations themselves are not specific, an interpretation that is found by the court to be incorrect can still be said to be reasonable.

Defendants claimed, through the testimony of Ray Myers and Sally Brian, that the County made a significant effort following the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), to familiarize itself with the FLSA, and to ensure that it was in compliance. In that respect, Ms. Brian attended many programs and seminars, reviewed all regulations and the FLSA itself and reviewed numerous treatises, Wage and Hour opinion letters and other pertinent materials.

Ray Myers, the Employee Relations Manager from 1982 through 1990 testified that the issue first came up in connection with the negotiations for the 1982–84 Memorandum of Understanding. At that time the parties agreed that, rather than receiving 5 per cent of the employee's base hourly rate for each on-call hour, the coroner investigators would receive an overall 5 percent pay increase in exchange. Thereafter, when the subject of compensation for on-call time was raised, Myers would point out to plaintiffs' negotiators that the 5 percent "premium pay" was meant to compensate for the requirement of on-call time.

In October, 1985, Ms. Brian conducted a meeting attended by members of the Coroner's Bureau, to discuss and obtain information regarding the FLSA. The issues of whether or not standby pay is compensable, and the restrictions under which standby pay would be compensable, were specifically discussed at the meeting.

The coroner investigators, by their professional bargaining team, initially took the

position that on-call hours were compensable. Ms. Brian researched the matter, at Mr. Myers' request, and Ms. Brian presented the coroner investigators' team with the authorities used as the basis for the County's position. On-call time was not to be compensated.

The issue was raised again during negotiations for the 1988–90 collective bargaining and the parties ultimately, once again, agreed that the on-call time was not compensable. (Brian testimony)

Myers and Brian testified that the County representatives attempted to obtain as much information as they could on the FLSA in general and on-call time in particular. They consulted applicable regulations, educated themselves concerning the proper standards, and then made an honest and good faith determination that the coroner investigators' on-call time was not compensable. The decision was made "above-board" and was "justified in public" in that it was addressed during repeated collective bargaining negotiations between the Sheriff's Department and the employees' union.

The County also claims it had reasonable grounds for believing that its conduct complied with the FLSA. As pointed out in *Bratt,* where, as here, the applicable regulations provide only general guidelines, it is difficult to say that there was a clear cut violation.

Plaintiffs disagree generally with defendants' version of events and offer the following guidelines: Plaintiffs note that the FLSA establishes a three-year statute of limitations for a cause of action "arising out of a willful violation." Otherwise the statute of limitations is two years. See, 29 U.S.C. § 255(a). In determining whether the violation was willful, the court should consider several factors.

Plaintiffs contend that under the standard set forth in *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), actions are willful when they are "voluntary," "deliberate," or "intentional," and not merely negligent. Furthermore, the Department of Labor regulations require the employer to be aggressive and vigilant in assuring that the FLSA is enforced and does not allow an employer to "sit back and accept the benefits without compensating for them." (29 C.F.R. § 785.13).

Plaintiffs offer evidence to show that defendants were content to ignore complaints about working conditions in the Coroner's Office, including the on-call schedule, and "sit back and accept the benefit" of the on-call schedule without compensating for it.

Since fiscal 1984–85, defendants have been repeatedly notified through the budget process that the Coroner's Office was "working at a 2.5 man deficit.", that additional personnel were needed to "ensure adequate coverage of death investigations with reduced on-call time, stress and overtime to meet the needs of the current caseload," and that current conditions sometimes required an individual to be on-call for 96 hours, and that the Coroner's Office needed at least one additional full-time qualified coroner's investigator to eliminate stress and excess overtime. (Pl.Ex. 28: Program Improvement Requests for Fiscal Year 84–85, 85–86, 87–88 and 88–89).

The increase in volume of cases was presented to the Board of Supervisors in 1986, 1987 and 1988 through the Coroner's Annual Report prepared by Dunham. (Pl. Ex. 25, 26, 27 (esp. p. 9, 16)).

Defendants were also informed of working conditions in the Coroner's Office through an "Employee Hazard Report" (Pl. Ex. 12) which complained of:

> Inadequate personnel in unit to safely handle excessive workload. Staff routinely works 24 hours per day (regular hours plus on-call duty) for four days in a row resulting in insufficient sleep and rest periods away from active duty, danger in use of county vehicles, officer alertness while contacting public.

Despite constant pleas for additional staffing from the Chief Deputy Coroner, defendants did not seek any written administrative ruling or advice from the Department of Labor or Administrator of the Wage and Hour Division as to its obli-

gations regarding compensation for on-call time.

Plaintiffs claim defendants' efforts to investigate were minimal, consisting of Brian's attendance at a seminar on the FLSA conducted by a management law firm and consulting a Department of Labor handout relating to nurses. This handout warned that employees who were unable to use on-call time for personal pursuits might be "engaged to wait" and therefore entitled to compensation. Despite this warning, Brian did not discuss the Coroner's on-call policy with Dunham or any deputy coroner, did not familiarize herself with Coroner's Office staffing, did not review any Coroner's Office documents reflecting frequency of calls, did not familiarize herself with deputy coroner duties and did not review the Annual Report.

According to plaintiffs, defendants reached their decision that on-call time was not compensable prior to collective bargaining negotiations and therefore did not bargain in good faith.

Further, plaintiffs believe defendants ceased investigating this issue in 1986, despite several Wage and Hour opinion letters which could, if applied to the deputy coroners' circumstances, have led defendants to believe their on-call time to be compensable. (Pl.Ex. 5, 6 and 7).

Plaintiffs argue that defendants have no defense under 29 U.S.C. § 259, since they did not seek a ruling or written opinion from the Wage and Hour Administration of the Department of Labor on the issue of compensability of on-call time for deputy coroners. If so, then defendants cannot claim under the statute that they were "in good faith in conformity with and in reliance on a written administrative regulation" of the Wage and Hour Administrator.

Defendants did not consult the appropriate regulations, according to plaintiffs, especially the regulations set forth in 29 C.F.R. § 553.221, applicable specifically to public agencies. Nor did defendants seek specific advice from the Department of Labor regarding the situation in the Coroner's Office.

If the County made inadequate efforts to ensure that its employment agreement with the coroner investigators complied with the FLSA, and the agreement and practice of defendants does not in fact comply with the FLSA, then the investigators may be entitled to liquidated damages, equal to the amount of the overtime pay due them. 948 F.2d at 1541.

In the *Renfro* case, the employer's representative made one phone call to the Department of Labor to determine whether their overtime compensation plan complied with the FLSA. They were unable at trial to remember anything except the name of the Department of Labor employee, neither her job title nor specifics of what she said. The court found this to be evidence that the employer did not have "reasonable grounds" for believing its position to be in compliance. *Id.*

 Applying the standards for determining the employer's good faith and reasonable grounds for assuming it was in compliance with the FLSA, this court finds that the Sheriff's Department was acting in good faith and was reasonable in assuming that its overtime compensation policy was in compliance with the FLSA. Personnel analysts had attended seminars, reviewed the statute and reviewed the U.S. Supreme Court decision in *Garcia*, as well as Wage and Hour rulings regarding other on-call employees.

The parties had raised and negotiated the issue of overtime pay for on-call hours as part of the collective bargaining process and had reached a resolution several times, albeit an unsatisfactory one for the plaintiffs.

Defendants did compensate the coroners for what defendants interpreted to be time worked while on-call.

Since defendants' violation of the FLSA was not wilful, plaintiffs are not entitled to liquidated damages. Furthermore, the applicable statute of limitations is two years, rather than the three years established for wilful violations. This affects plaintiffs' claim for compensatory damages.

This case was filed December 19, 1989. Plaintiffs may therefore claim damages only from December 19, 1987 to the present.

## DAMAGES

Plaintiffs have calculated their damages by multiplying their uncompensated hours of on-call time by their pay rate at the time they worked the hours by one and one-half, since these hours represented overtime.

The statistics are defendants', since defendants kept the records of hours worked (based on the deputy coroners' logs) and hours paid, as well as the records of the plaintiffs' rates of pay. The total amount claimed is $200,731.11.

Defendants' violation of the FLSA was in good faith; the applicable statute of limitations is two years. Plaintiffs' calculations should begin at December 19, 1987, two years before this case was filed. Any amount claimed for the period prior to December 19, 1987 shall be subtracted from plaintiffs' award. Plaintiffs shall prepare a revised calculation of their damages and submit it to the Court.

Plaintiffs are also entitled to an award of attorney's fees, as provided by 29 U.S.C. § 216(b). Plaintiffs shall prepare a sworn declaration detailing the hours expended in this action and the billing rate of counsel, as well as associated costs of suit.

## CONCLUSION

This court enters judgment for plaintiffs in the amount of $200,731.11, less calculated unpaid overtime prior to December 19, 1987. Plaintiffs shall prepare and submit to the court the appropriate re-calculation of plaintiffs' damages. This court also awards attorney's fees and costs as substantiated by plaintiffs. This court declines to award liquidated damages, finding that defendants acted in good faith and with reasonable grounds for believing that they were in compliance with the FLSA.

## ON MOTION TO RECONSIDER

The parties' post-trial motions came on for hearing on April 30, 1992. Appearing for moving party was W. David Holsberry, Esq. of Davis, Cowell & Bowe. Appearing for defendants was Patrick Grattan, Esq., of Geary, Shea, O'Donnell & Grattan. Plaintiffs moved to correct the amount of the damage award and for an award of attorney's fees. (The motion to correct the amount of the award was submitted without oral argument, pursuant to Local Rule 220–1). Defendants moved for the court to reconsider its findings and conclusions contained in the Memorandum Opinion of February 28, 1992 and enter judgment for defendants. The moving and opposing papers and argument of counsel having been fully considered and good cause appearing,

IT IS HEREBY ORDERED that the plaintiffs' motions to correct the amount of the damage award and application for attorney's fees are GRANTED. Defendants' motion for reconsideration and to amend the judgment is DENIED.

## CORRECTION OF AMOUNT OF DAMAGE AWARD

In its Memorandum Opinion of February 28, 1992 this court awarded damages for unpaid overtime to plaintiffs in the amount of $200,731.11, less unpaid overtime accrued prior to December 19, 1987. This amount reflected the calculation submitted with the pre-trial statement some months prior to trial. Plaintiffs' total claim for unpaid overtime, from December 19, 1986, up to the date of trial, however, is $280,-074.03. The court found that the statute of limitations for this claim is two years, since defendants did not show bad faith. Plaintiffs' claims for unpaid overtime prior to December 19, 1987 are $38,407.81. Subtracting the overtime for the year prior to the statute of limitations yields plaintiffs' claim for damages from December 19, 1987 to time of trial: $241,666.22. Plaintiffs substantiated their claims using documents such as work logs and other pay records admitted into evidence at trial. The motion to correct the amount of the damage award is therefore GRANTED.

## MOTION TO AMEND JUDGMENT

Defendants requested that the court reconsider certain findings of fact and conclu-

sions of law in its Memorandum Opinion of February 28, 1992. Defendants also requested that the court, on the basis of this reconsideration, render judgment for defendants in this case. The issues which defendants request the court to reconsider are:

1) whether the 5% pay increase received by plaintiffs in 1982 was compensation for on-call time;

2) the number of calls plaintiffs received while on-call requiring an in-person response;

3) number of telephone calls initiating a death investigation plaintiffs received while on-call.

The court considered the moving and opposing papers and the argument of counsel. The court finds that there is no basis for reconsidering its findings and conclusions and therefor the motion to amend the Memorandum Opinion and enter judgment for defendants is DENIED.

### APPLICATION FOR ATTORNEY'S FEES

Plaintiffs applied for an award of attorney's fees, pursuant to this court's order of February 28, 1992 and the mandate of the Fair Labor Standards Act, specifically 29 U.S.C. § 216(b). The fee award requested is $215,260.00. This represents 1024.8 hours at $200 per hour, plus an additional 51.5 hours incurred between April 1 and the date the matter was submitted.

After considering the moving and opposing papers and the argument of counsel, this court has determined that the application for attorney's fees should be GRANTED. The court's reasoning is as follows:

### ATTORNEY'S FEE: BACKGROUND

■ Plaintiffs, coroner's investigators assigned to the Sonoma County Sheriff's Department, successfully sued their employer under the Fair Labor Standards Act (FLSA) 29 U.S.C. § 201 *et seq.* for compensation for hours spent "on-call." This court's memorandum opinion of February 28, 1992 authorized plaintiffs to substantiate the amount of attorney's fees requested. The fee award is mandated by the FLSA 29 U.S.C. § 216(b), which states:

> The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

The amount is up to the court's discretion.

### POSITIONS OF THE PARTIES

Briefly summarized, defendants claim that plaintiffs' counsel is charging too high a fee, for too many hours. They contend that the results he obtained were only partially favorable to his clients and that the use of a multiplier is not justified, since the same factors which would justify a multiplier have also been used to justify a higher hourly rate. Defendants also claim that the factors listed in *Kerr* do not justify the amount of fees requested, which would be almost equal to the damage award. *Kerr v. Screen Extras Guild,* 526 F.2d 67 (9th Cir.1975) *cert. den.* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

Plaintiffs claim that their counsel's fee is the customary charge for this type of case, and that the hours were required because the case was continued three times and because the parties filed cross-motions for summary judgment. The results obtained were the ultimate result plaintiffs wanted: to be compensated for their on-call time. The use of a multiplier was justified because of the risk that counsel took handling this case on a contingent fee basis, and because of the quality of the work done. According to the *Kerr* factors, plaintiffs counsel set precedent in this Circuit in the area of on-call compensation for public employees, and there are several cases where the fee award far exceeded the damage award, yet was affirmed on appeal. Plaintiffs request a fee of at least $204,960.00 (1024.8 hours times $200 per hour), the "lodestar" figure. Plaintiffs also request that the court apply a multiplier, between 1.25 and 1.5, which would produce a higher award. Plaintiffs also request fees for an additional 51.5 hours of attorney time incurred between April 1 and the date of this hearing, for which the total fee is $10,300.00.

In reaching its decision, the court has considered the following issues:

## IS THERE COMPETENT EVIDENCE THAT $200 IS A REASONABLE HOURLY RATE?

Defendants claim there is no supporting evidence, for example, declarations from other attorneys practicing in the field. There is also no explanation offered for the different hourly rates plaintiffs' counsel charges: $110 for individual union members, $145 for unions, $200 for contingent fee cases. Defendants question whether there really is a contingent fee agreement, because plaintiffs do not offer a copy.

Plaintiffs' counsel says that he is knowledgeable about fees in this area of practice because he has served for ten years as an arbitrator of attorney fee dispute for the Bar Association of San Francisco. He has had opportunities to review fee requests in many other cases.

Plaintiffs' counsel offers a supporting declaration from a labor attorney in which he states that the Ninth Circuit awarded fees of $190 per hour to a partner in his firm for successful work on a FLSA case. Plaintiffs' counsel explains that counsel's reduced fees ($110 per hour) allow union members to have expert representation even where the union is not paying for their attorney's services. Counsel offers a copy of the contingent agreement with plaintiffs as an exhibit to his declaration in support of the Reply.

The court concludes that counsel is a partner with fifteen years' experience in a firm specializing in labor law. He himself has arbitrated fee disputes and is conversant with the range of legal fees in the San Francisco area. Other attorneys with his experience have received similar hourly fees from the Court of Appeals. His fee for this case is reasonable.

## IS 1024 HOURS EXCESSIVE?

Defendants claim that plaintiffs' counsel failed to use "billing judgment" as required by the Supreme Court decision in *Hensley:*

"In the private sector 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

Defendants complain that virtually all the time on this case was billed by a partner with fifteen years' experience, rather than by an associate or paralegal. In fact, only 4.9 hours of the 1024 were billed by an associate.

Plaintiffs' counsel responds that he had much of the summarizing of data done by the plaintiffs themselves, to save the charges of attorneys, paralegals and accountants.

Plaintiffs' counsel says that he did most of the work on the case because he is the only one in the office familiar with FLSA work. Also, because it was a contingency case, he did not want to "train" somebody new and risk losing the case and receiving no fee.

He also makes it a practice to do most discovery himself, to know the case more thoroughly.

This court finds that this was a factually complex case, requiring a great deal of attention to detail. Counsel was the only attorney in his office familiar with the FLSA, and the case was taken on a contingency basis. It was reasonable for counsel, an experienced partner, to handle the case himself, rather than train a new associate.

This court concludes that 1024 hours is a reasonable amount of time, given the circumstances of the case.

## IS THE USE OF A MULTIPLIER JUSTIFIED?

Plaintiff's counsel requests that the lodestar fee ($200 per hour times 1024.8 hours) be increased by a factor between 1.25 and 1.5, a multiplier which he says reflects the quality, risk and delay considerations in this case.

Defendants resist this strenuously, arguing that where a labor law attorney charges specialist rates for handling a labor law case, neither complexity nor novel-

ty of issues is an appropriate factor on which to base an upward adjustment. Those were reflected in the number of billable hours, and the attorney's special skills that reduced the number of his hours. These are reflected in the specialist's rates. *Blum v. Stenson,* 465 U.S. 886, 898, 901, 902, 104 S.Ct. 1541, 1550, 1550–51, 79 L.Ed.2d 891 (1984). Specific evidence is required for an upward adjustment (*Id.* at 898, 104 S.Ct. at 1548).

Furthermore, there is a strong presumption against the use of a multiplier. *Pennsylvania v. Delaware Valley Citizen's Counsel for Clean Air (II)* 483 U.S. 711, 730, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987).

Plaintiff cites a number of civil rights cases which authorize use of a multiplier to compensate for the risk of taking a case on a contingent fee basis, as well as the quality of service and the delay between rendering of service and payment of fees.

Another category of case where a multiplier has been approved in a fee award acknowledged the impact on other employees of the court's decision in the case *Thompson v. Barrett* 599 F.Supp. 806 (D.C.Cir.1984).

■ Plaintiffs have not shown that this is the kind of landmark case requiring application of a multiplier to an award of attorney fees. Plaintiffs offer no evidence of the risk of this case, relative to other similar cases. In fact, plaintiffs' counsel says that he has settled other FLSA cases, presumably with a result favorable to his clients. The case was not legally complex, although it was factually detailed. The case also did not drag on for years, like some of the cited cases. The case does not necessarily affect a nationwide class of workers, like some of the cited cases.

This court finds that the quality, risk and complexity of this case are not sufficient to justify use of a multiplier.

ARE FEES JUSTIFIED, APPLYING *KERR* FACTORS?

The parties disagree whether plaintiffs' attorney's fees are justified by applying the factors enumerated in *Kerr v. Screen*

*Extras Guild,* 526 F.2d 67 (9th Cir.1975) *cert. den.* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 1 (1976).

*See also Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which held that "reasonable attorney's fees must be determined by the facts of each case."

These principles have been applied to FLSA cases in *Newhouse v. Robert's Ilima Tours, Inc.,* 708 F.2d 436, 440–441 (9th Cir.1983).

This court may view one guideline as controlling, as long as it has considered the others *Vanelli v. Reynolds School Dist. No. 7,* 667 F.2d 773, 781 (9th Cir.1982).

## KERR FACTORS

### 1) TIME AND LABOR INVOLVED

■ Plaintiffs point out that the trial of this case was continued three times, once because plaintiff McAllister was called for military duty, once because the parties stipulated to trial before a magistrate, and once because defendants represented that settlement negotiations might be productive. Furthermore, both sides filed cross-motions for summary judgment, which were time-consuming but provided guidance to the trial court. Discovery and document review were extensive, involving many documents, as shown by the trial exhibits. Virtually every issue in the case was contested.

Plaintiffs contend that every item in their list of charges would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest. *Twin City Sportservice v. Charles O. Finley & Co.,* 676 F.2d 1291, 1312–1314 (9th Cir.1982).

Defendants retort that the hours billed (1024.8) were excessive. Matters *in this case* were not delegated to associates or paralegals, but were handled almost exclusively by a partner with 15 years' experience, billing at the firm's premium rate. Defendants object to the lack of detail in plaintiffs' attorney's time record.

Plaintiffs' counsel says that he did most of the work on the case because he is the only one in the office familiar with FLSA work. Also, because it was a contingency case, he did not want to "train" somebody new and risk losing and receiving no fee.

Plaintiffs' counsel also adds that since April 1, 1992 he has spent an additional 51.5 hours on this case.

The court finds that it was reasonable for counsel to spend the amount of time he did on this case. Further, the additional hours were necessary to respond to defendants' motion to amend the judgment and to comply with the court's request for substantiation of plaintiffs' attorney's fees.

The time spent justified the fee award.

## 2) NOVELTY AND DIFFICULTY OF ISSUES

Plaintiff believes that at the time this action was filed, there were few if any 9th Circuit cases regarding compensation for on-call time worked by public employees.

Defendants respond that if the case was so novel and complex, why did plaintiffs' counsel spend only 27 hours on legal research? They characterize this as largely a factual dispute.

Plaintiffs' counsel says that in his computer time records (Ex. 1 to Declaration in Support of Reply Memo) where it says "preparation of pleadings" that time also includes the research necessary to prepare the pleadings. He did far more than 27 hours of legal research.

The court finds that the issues in this case were novel, given there were no cases on point in the 9th Circuit and that the *Renfro* case in the 10th Circuit was only decided at the appellate level after this case had come to trial.

## 3) SKILL REQUISITE TO PERFORM THE LEGAL SERVICE PROPERLY

Plaintiffs' counsel is a highly qualified labor lawyer, who has handled other FLSA cases involving public employees. Defendants concede counsel's qualifications.

## 4) PRECLUSION OF OTHER EMPLOYMENT

Plaintiffs' counsel says that he delegated work on other cases to associates and paralegals in his office, to devote himself to this case. .

Defendants say that this factor means preclusion of employment by the attorney's *firm,* and it refers to work lost because of the case. *Planned Parenthood v. Arizona,* 789 F.2d 1348 (9th Cir.1986).

This court finds that it is possible counsel's firm was precluded from taking any other FLSA cases, since he was the only one knowledgeable in that area, but there is no evidence that the firm itself lost business as a result of this case.

## 5) CUSTOMARY FEE

Plaintiffs' counsel offers his firm's regular schedule of fees over the past few years, which is currently $110 per hour for individual union members, $145 per hour for unions themselves, and $200 for contingent fee cases.

Defendants argue that there is no competent evidence that any of these fees are actually charged to clients.

The court questioned plaintiffs' counsel about what would happen if the court awarded fees under the FLSA statute: would counsel also receive his contingency fee? Counsel stated that if the statutory award equalled or exceeded the amount which counsel would have received under the contingency agreement, that the statutory award would be the sole fee he received.

The court accepts counsels representation that this is the customary fee used in his office in contingency cases.

## 6) WHETHER FEE IS FIXED OR CONTINGENT

Counsel says that plaintiffs told him they could only retain him on a contingent fee basis. If they had not prevailed, counsel would have received no fee. A copy of the contingent fee agreement is attached to counsel's declaration in support of his Reply Memorandum as Exhibit 2.

Defendants object that there is no representation that plaintiffs are indigent, or could not have paid the $110 hourly fee for union members. Defendants ask that plaintiffs show the degree to which the relevant legal market compensates for contingencies. *King v. Palmer*, 906 F.2d 762 (D.C.Cir.1991).

Plaintiffs' counsel offers a copy of the Contingency Fee Agreement signed by plaintiffs (Ex. 2 to Declaration in Support of Reply). It provides for recovery of 40% of net award as a fee. This court concludes that the fee was contingent.

### 7) TIME LIMITATIONS IMPOSED BY CLIENT OR CIRCUMSTANCES

Plaintiffs' counsel claims the time limitations in this case are continuing. He had either to settle or file suit at the earliest possible time to achieve the greatest retroactivity.

Defendants say there was only an initial delay of four months between the time plaintiffs' counsel first contacted them with a demand and the filing of the case, after defendants declined to settle.

The court concludes that the question of delay is speculative. Every case has to have some dead time between the initial contact and filing suit.

### 8) AMOUNT INVOLVED AND RESULTS

The total amount of the award is in excess of $200,000.00.

Plaintiffs achieved their "primary goal," which was compensation for on-call hours. *See Rivera v. City of Riverside*, 679 F.2d 795, 797 (9th Cir.1982).

Defendants counter that because plaintiffs did not receive liquidated damages that the award was only half what they requested, and less than the attorney's fee requested (with the multiplier).

This court concludes that plaintiffs did achieve their primary goal. Liquidated damages would have been "icing on the cake" and should not be considered to be something the plaintiffs lost. The result achieved was very good.

### 9) EXPERIENCE, REPUTATION, ABILITY OF ATTORNEY

Plaintiffs' counsel offers his qualifications in his Declaration and defendants do not dispute that he is a well-qualified labor lawyer. The parties concede counsel's qualifications.

### 10) UNDESIRABILITY OF CASE

Both sides agree that the case is not undesirable in the sense that there would be no adverse public reaction to plaintiffs' counsel's taking the case. However, plaintiffs' counsel says the case is undesirable in that there is a risk of nonpayment under the contingent fee agreement. Both sides concede the case is not undesirable because of the nature of the dispute. This court finds that the case is not undesirable in the sense that it would cause counsel to lose other clients.

### 11) NATURE AND LENGTH OF PROFESSIONAL RELATIONSHIP

Both sides agree that this is the first and only case counsel has had with these clients.

### 12) AWARDS IN SIMILAR CASES

Plaintiffs' counsel offers examples of awards in other cases:

Eight plaintiffs awarded $100,000 in attorney's fees and $18,455 in damages. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1468 (9th Cir. 1983).

Plaintiffs awarded $25,000 in attorney's fees, $12,841.27 in damages. *Newhouse v. Robert's Ilima Tours, Inc.*, 708 F.2d 436 (9th Cir.1983).

Defendants warn that there is not necessarily a relationship between the amount of damages and the award of fees in different cases.

This court concludes that the amount of the fee award is not tied to the amount of damages—this works both ways—it could mean either that the fee award could be the greater or lesser of the two.

### CONCLUSIONS

$200 per hour is a reasonable fee. 1024.8 hours is a reasonable amount of

time, given the circumstances of the case. The additional 51.5 hours were necessary to respond to defendants' motion to amend the judgment and the court's request for substantiation of the amount of the fees.

Use of a multiplier is not justified, since the same factors have been taken into account in the hourly fee, number of hours and contingency agreement and the case is not legally complex or risky enough to justify use of a multiplier. The time spent justified the amount of fees. The issues in this case were novel, given there were few relevant FLSA cases in the U.S. Court of Appeals for the Ninth Circuit and the *Renfro* case in the Tenth Circuit was only decided at the appellate level after this case had come to trial. The parties concede plaintiffs' counsel is qualified. It is possible counsel's firm was precluded from taking any other FLSA cases, since he was the only one in the firm knowledgeable in that area, but there is no evidence that the firm itself lost business as a result of this case. The issue of delay is speculative. Every case has to have some dead time between the initial contact and filing suit. Plaintiffs did achieve their primary goal. Liquidated damages would have been "icing on the cake" and should not be considered to be something the plaintiffs lost. The result achieved was very good. Both sides concede that the case was not undesirable. Plaintiffs and counsel have had an attorney-client relationship only for this case. The amount of the fee award is not tied to the amount of damages—this works both ways—it could mean either that the fee award could be the greater or the lesser of the two.

Plaintiffs' counsel should receive the full hourly fee multiplied by the full number of hours billed, but with no multiplier. Counsel should also receive the fee for the additional 51.5 hours incurred between April 1, 1992 and date of hearing. The total fee award is $215,260.00.

SO ORDERED.