30 F.3d 1174
 128 Lab.Cas. P 33,114, 2 Wage & Hour Cas.2d
(BNA) 299
 Gregory BERRY; Forrest Fasig; Phillip Marcus; Dennis
McAllister; Francis Oravetz; and N. Tom Siebe,
Plaintiffs-Appellees, Cross-Appellants,
v.
COUNTY OF SONOMA; Sonoma County Sheriff's Department;
Sonoma County Board of Supervisors; Janet Nicholas; James
Harberson; Tim Smith; Nick Esposito; Ernest Carpenter;
and Richard Michaelson, Defendants-Appellants, Cross-Appellees.
 Nos. 92-16772, 92-16816.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 11, 1994.
Decided July 26, 1994.
 
 Steven L. Mayer, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, CA, for defendants-appellants, cross-appellees.
 W. David Holsberry, Davis, Cowell & Bowe, San Francisco, CA, for plaintiffs-appellees, cross-appellants.
 Appeal from the United States District Court for the Northern District of California.
 Before: NOONAN, NELSON, Circuit Judges, and EZRA,* District Judge.
 T.G. NELSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Gregory Berry (Berry), Phillip Marcus (Marcus), Dennis McAllister (McAllister), and Francis Oravetz (Oravetz), current and former deputy coroners (collectively referred to as "the coroners") brought this action against their employer, the Sonoma County Sheriff's Department, the County of Sonoma and the Sonoma Board of Supervisors (collectively referred to as "Sonoma County"), seeking overtime compensation for time spent waiting on-call from December 1986 until the present pursuant to the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. Secs. 201 et seq. The district court held that Sonoma County had violated the FLSA by failing to compensate the coroners for on-call waiting time and awarded them damages and attorneys' fees pursuant to 29 U.S.C. Sec. 216(b). However, the district court limited its award by holding that Sonoma County's FLSA violation was in good faith, based on a reasonable belief of compliance, and was not willful. As a result, the coroners were not entitled to liquidated damages, see 29 U.S.C. Sec. 260, and the statute of limitations was two years, instead of three years, see 29 U.S.C. Sec. 255(a).[1] Sonoma County appeals the judgment for the coroners. The coroners cross-appeal the district court's holding that Sonoma County did not willfully or in bad faith violate the FLSA and request attorneys' fees. We reverse the district court's judgment in favor of the coroners.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 The coroners are required by California state law to respond to certain reported deaths twenty-four hours a day, seven days a week, including holidays. See Cal.Gov't Code Secs. 27491 et seq.; Cal.Health & Safety Code Secs. 10250 et seq. The Coroner's Office has regular business hours Monday through Friday from 8 a.m. to 5 p.m. However, because the coroners have a statutory obligation to be available at all times, one coroner is always "on-call" when no coroner is "on-duty."
 
 
 3
 The investigations a coroner conducts while on-call are very similar to those which he conducts while on-duty. Death reports are immediately reported to the on-call coroner regardless of the time received. To maintain communication, Sonoma County provides coroners with a telephone, pager, two-way radio and county van. The parties agree that the coroners respond as soon as possible to death reports and are required to answer a page or telephone call within fifteen minutes.[2] When a death report is received, if the coroner determines it is a coroner's case, he either conducts an investigation by telephone or visits the scene of the death depending on the nature of the case.
 
 
 4
 Two factors distinguish on-call duties from regular duties. First, while on-call, a coroner is not required to respond to reports of nursing home deaths but may postpone such an investigation until his next regular on-duty shift. Second, when a coroner is on-call, he is not required to be at the Coroner's Office. Instead, he may conduct his investigations from his home or other locations outside the office but within Sonoma County.
 
 
 5
 Because of the requirement that coroners be immediately available to investigate death reports while on-call, the coroners claim their personal activities while waiting on-call for a death report are restricted. They claim they are not able to leave Sonoma County to engage in hobbies or activities such as camping, hunting, fishing, socializing and attending sporting events. Further, they remain in areas which are accessible by pager. They do not engage in activities where interruptions would be unwanted such as attending movies, dining out, shopping or working on labor-intensive tasks. They remain prepared to meet the public by not engaging in activities in which they would become dirty and by not consuming alcohol in amounts which would affect their sobriety. Finally, when they do travel, they are forced to take a separate vehicle because citizens may not ride in the county van.[3]
 
 
 6
 Despite the restrictions on their personal activities created by geographical, communication and transportation limitations, the record reflects activities in which the coroners have been able to participate while on-call. Coroners have been able to socialize with friends, dine out, shop, read, watch television and enjoy hobbies such as gardening, working on antique cars, leather crafts and photography. Berry taught a course at a local junior college and held the position of Battalion Chief of the local volunteer fire department.
 
 
 7
 Prior to 1982, coroners received five percent of their hourly pay for each hour on-call. However, in 1982 a new agreement was reached, the relevant provisions of which have been incorporated into successive Memorandums of Understanding (MOUs) resulting from collective bargaining between Sonoma County and the Sheriff's Office Employee Association (Association). Pursuant to the 1982 agreement, coroners received a five percent increase in their base salaries. No overtime compensation is paid for time spent waiting on-call and not actually working. However, for each death report investigated while on-call, the coroner receives guaranteed minimum overtime pay, regardless of the time it takes to investigate the death report, calculated at a rate of one and one-half times the regular hourly rate. Initially, the coroners received a two-hour guaranteed minimum for each death report investigated while on-call. Later, the hourly minimum was reduced for telephone cases. Now, for each telephone case investigated, a coroner receives a minimum of one hour paid overtime. For each call-back case investigated, a coroner receives a minimum of two hours paid overtime.
 
 
 8
 During collective bargaining sessions in 1986, 1988 and 1990, the Association requested overtime pay for all hours during which a coroner was on-call. These requests were rejected. The only other evidence that the coroners were dissatisfied with the working conditions as a result of on-call duty was an Employee Hazard Report filed in July 1988 by Berry, Marcus and another deputy coroner not a party to this suit. According to the report, because the coroners were required to work twenty-four hours per day for four days consecutively, they were receiving insufficient sleep and rest periods away from active duty. The coroners requested an increase in staff to reduce the work load thereby relieving them of the four day consecutive work shift.
 
 
 9
 The coroners brought this action pursuant to the FLSA against Sonoma County seeking overtime compensation for on-call waiting time, i.e., the time on-call which coroners were required to be prepared to investigate death reports but were not actually working, from December 1986 until the present. The district court denied the parties' cross-motions for summary judgment,[4] finding disputed facts regarding whether the coroners were able to conduct personal activities during on-call shifts and whether Sonoma County violated the FLSA willfully or in bad faith. It also found material issues of fact relating to the amount of damages.
 
 
 10
 After a five day trial, the district court held that Sonoma County had violated the FLSA by failing to compensate the coroners for on-call waiting time and awarded them damages and attorneys' fees pursuant to 29 U.S.C. Sec. 216(b). However, the district court limited its award by holding that Sonoma County's FLSA violation was in good faith, based on a reasonable belief of compliance, and not willful. As a result, the coroners were not entitled to liquidated damages, see 29 U.S.C. Sec. 260, and the statute of limitations was two years, opposed to three years, see 29 U.S.C. Sec. 255(a). Sonoma County appeals the judgment for the coroners. The coroners cross-appeal the district court's holding that Sonoma County did not willfully or in bad faith violate the FLSA and request attorneys' fees on appeal.DISCUSSION
 
 I. On-Call Time as Compensable Overtime
 
 11
 In general, the FLSA requires that employers pay overtime compensation to employees for hours worked in excess of forty hours per work week. 29 U.S.C. Sec. 207(a). We recently addressed the issue of whether on-call waiting time, i.e., time spent on-call but not actually working, is compensable overtime under the FLSA in Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers, 971 F.2d 347, 350 (9th Cir.1992), where mechanics at a pulp mill sought overtime pay for on-call waiting time. We held that the two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are "(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties." Id. (footnotes omitted). Finding express, constructive and collective bargaining agreements between the parties and that mill mechanics were free to engage in their own personal activities, we reversed the district court's summary judgment holding that on-call waiting time was compensable work. Owens controls our decision in this case.
 
 A. Standard of Review
 
 12
 We review the district court's findings of fact for clear error and its interpretations of the FLSA de novo. Drollinger v. State of Arizona, 962 F.2d 956, 958 (9th Cir.1992). Whether and to what extent employees are able to use on-call time for personal activities is a question of fact. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986); Birdwell v. City of Gadsden, Ala., 970 F.2d 802, 807-08 (11th Cir.1992). However, whether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable overtime under the FLSA is a question of law which we review de novo. See Birdwell at 807 ("Whether a certain set of facts and circumstances constitute work for purposes of the FLSA is a question of law."); cf. Icicle Seafoods, 475 U.S. at 714, 106 S.Ct. at 1530. Whether there was an agreement between the employer and the employees that employees would receive compensation only for actual work conducted while on-call is also a question of fact which must stand absent clear error. Rousseau v. Teledyne Movible Offshore, Inc., 805 F.2d 1245, 1248 (5th Cir.1986), cert. denied, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987).
 
 
 13
 B. Agreements Between the Parties Regarding Compensation for Overtime
 
 
 14
 As previously noted, agreements between the parties are one of the predominant factors to be considered in determining whether the employees' on-call waiting time is compensable.[5] Owens, 971 F.2d at 350. In Owens, this court found the possibility of three different types of agreements between the employer and employees which may be relevant to the issue of on-call compensation. An agreement may be found if employees are employed pursuant to a "collective bargaining agreement that provide[s] overtime compensation for actual call-in work, but not for other off-duty time." Id. at 355. A constructive agreement may arise if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy. Id. at 354-355. Finally, an express agreement is created if the employees voluntarily accept the terms of the policy by becoming employed after an overtime compensation policy has been implemented. Id. at 355.
 
 
 15
 The significance and importance of evaluating the agreements between the parties is that the existence of such agreements assists the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work. An agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work. Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work.
 
 
 16
 Our emphasis of the parties' agreements as a predominant factor is not intended to suggest that agreements are controlling regardless of the character of the uncompensated time at issue. The Supreme Court stated in Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602, 64 S.Ct. 698, 705, 88 L.Ed. 949 (1944), that the FLSA was not designed to perpetuate contracts pursuant to which employers fail to compensate employees for work. The Court in that case noted that there was no uncertainty that the uncompensated time at issue, i.e., time spent travelling underground in mines to the work site, was actually work. Id. However, it specifically noted that it was not addressing a situation where there were "serious doubts as to whether certain activity or non-activity constitute[d] work or employment." Id. at 603, 64 S.Ct. at 705. In such a situation, the parties' agreements are persuasive evidence of whether they intended to define the activity or non-activity as work. Unlike the uncompensated time at issue in Muscoda, there is uncertainty whether on-call waiting time is actual work, and consequently, inquiry into the parties' characterization of on-call waiting time is necessary.
 
 
 17
 The district court in this case concluded the parties had an agreement regarding overtime compensation. Focusing on the collective bargaining agreement between the parties, it found:
 
 
 18
 [T]he parties did have an agreement regarding compensation for work done during on-call shifts. The agreement included a two-hour minimum, later reduced to a one-hour minimum, at one and one-half times the deputy's regular hourly pay, for telephone investigations and a two-hour minimum, at the same rate, if the deputy were actually called to a death scene, regardless of the actual time spent.
 
 
 19
 Berry, 791 F.Supp. at 1415. Also relevant to the existence of an agreement between the parties is the district court's finding that "each plaintiff understood the requirements of the job before he applied for and accepted the position." Id. at 1413.
 
 
 20
 These findings support the conclusion that Sonoma County's overtime compensation policy was pursuant to agreements between the parties. The parties' collective bargaining agreement, memorialized by MOUs, expressly provides for "compensation for work done during on-call shifts," id. at 1415, but does not provide compensation for on-call waiting time.[6] Also, three of the coroners expressly agreed to Sonoma County's overtime compensation policy by accepting employment after the policy had been implemented in 1982.[7] The district court's finding that the coroners all knew the requirements of the job before they applied and accepted the position supports the conclusion that these coroners expressly agreed to the policy. Finally, although Berry did not expressly agree to the policy because he became a coroner prior to implementation of the policy, he continued to work pursuant to the policy for nine of the eleven years Sonoma County employed him as a coroner; as a result, Berry constructively agreed to the policy.
 
 
 21
 The coroners object to consideration of the collective bargaining agreement as a predominant factor. They offer several arguments, including these: MOUs do not incorporate the FLSA; Sonoma County's on-call policy does not attempt to comply with FLSA standards because it was initially implemented in 1982 prior to the application of the FLSA to public agencies; and neither the Association, representing the coroners during collective bargaining, nor the coroners themselves have acquiesced to the on-call system. None of these arguments has merit.
 
 
 22
 It is true each of the MOUs expressly stated that they do not intend to incorporate the FLSA into the contract. However, this exclusion does not preclude review of the MOUs to determine if the parties defined on-call waiting time as compensable work. Further, the coroners' claim that the MOUs reflect an on-call compensation policy which was implemented in 1982 before the FLSA applied to public agencies does not preclude review of the collective bargaining agreement. The FLSA became applicable to local government entities in 1985. See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 556, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1985). The coroners seek overtime compensation from 1986 until the present. Even though the policy was initially implemented in 1982, it has been subject to renegotiation in 1986, 1988 and 1990, continues presently and is relevant to an inquiry regarding whether on-call waiting time is characterized as work.
 
 
 23
 Finally, contrary to the coroners' claim, evidence is lacking to find the coroners have not acquiesced to the terms of the collective bargaining agreement. Continuous protests to an agreement prevent acquiescence to that agreement even though employees continue to work pursuant to it. See Beebe v. United States, 640 F.2d 1283, 1291, 226 Ct.Cl. 308 (1981) (employees continuously objected to computation of overtime pay and sought relief from time FLSA became applicable); cf. Johnson v. City of Columbia, S.C., 949 F.2d 127, 131 (4th Cir.1991) ("[I]f the employee did not protest and continued to work and receive paychecks, the courts have found that an implied agreement did arise between the parties."). The Employee Hazard Report submitted in July 1988 is the only evidence that the coroners themselves protested the overtime requirements of their position. This evidence is insufficient to find coroners have not acquiesced in the policy for several reasons. First, it does not support the conclusion that the objection to the policy was on-going and continuous; instead, it was only a singular incident. Second, the report only objects to the amount of overtime required; it did not object to the lack of compensation for that overtime which is now at issue. Finally, the report was submitted only by Berry and Marcus. There is no evidence that McAllister and Oravetz subsequently adopted the report. Furthermore, the Association's requests during collective bargaining for additional overtime compensation do not support a finding that the Association was actually protesting overtime compensation; at most, the requests merely reflect the Association's overall purpose of obtaining better employment terms. Despite the coroners' many objections to the relevance of the collective bargaining agreement, it is relevant to the parties' characterization of on-call waiting time.
 
 
 24
 We hold that Sonoma County's overtime compensation policy is pursuant to constructive and express agreements and collective bargaining agreements between Sonoma County and the coroners and that the terms of those agreements are that the coroners will receive compensation only for actual work conducted on-call and not for on-call waiting time. Although these agreements are not dispositive, their characterization of on-call waiting time weighs against concluding on-call waiting time is work.
 
 
 25
 C. Coroners' Ability to Engage in Personal Activities as a Predominant Factor
 
 
 26
 Another predominant factor in determining whether on-call waiting time is compensable is "the degree to which the employee is free to engage in personal activities." Owens, 971 F.2d at 350 (footnote omitted). The proper inquiry is "whether [an employee] is so restricted during on-call hours as to be effectively engaged to wait." Id. at 354. The requisite degree to which an employee must be free to engage in personal activities does not require that:
 
 
 27
 the employee ... have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject.
 
 
 28
 Id. at 350-51 (quoting Bright v. Houston Northwest Medical Ctr. Survivor, Inc., 934 F.2d 671, 677 (5th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992)).
 
 
 29
 In Owens, we provided an illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal activities while on-call. Id. at 351. It included:
 
 
 30
 (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.
 
 
 31
 Id. (footnotes omitted). Because "[n]o one factor is dispositive," id., a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait. Because the district court did not have the guidance of our decision in Owens, it failed to make conclusions regarding the proper inquiries. However, relying on its findings, these conclusions can be made by this court. We hold all of the relevant factors in this case, except perhaps one, weigh in favor of concluding the coroners are free to engage in personal activities while on-call.
 
 
 32
 1. Whether On-Call Duties are Similar to and as Demanding as Regular Duties
 
 
 33
 The district court considered whether the coroners' duties on-call are similar to and as demanding as their regular duties, noting that a similarity of duties "would tend to show restrictions on their ability to pursue personal activities." Berry, 791 F.Supp. at 1401. It concluded that "on-call investigations were substantially the same as on-duty investigations." Id. at 1402 (emphasis added). The district court did not compare on-call waiting time to regular duty, however. Although we held in Owens that a court's inquiry is not limited to a specific set of factors, see 971 F.2d at 351 (list is illustrative, not exhaustive), we hold that inquiry into the similarity of on-call duties and regular duties is improper because the coroners are compensated for on-call investigations.
 
 
 34
 The district court relied on Townsend v. Mercy Hosp. of Pittsburgh, 862 F.2d 1009 (3rd Cir.1988), to conclude that the similarity between investigations on-call and on-duty was relevant. In Townsend, the court addressed the issue of whether operating room personnel's on-call waiting time was compensable at one and one-half times the regular hourly rate. The hospital paid personnel one and one-half the regular hourly rate for actual work done while on-call, but only one and one-half the minimum wage rate for on-call waiting time. The court compared "the duties performed during the 'non-productive' periods on the on-call shift," i.e., on-call waiting time, to "the duties performed by the operating room personnel during the regular shifts." Id. at 1012. Because of the substantial and qualitative difference between regular duty and on-call waiting time, the court held on-call waiting time was not compensable at the regular hourly rate. Id.
 
 
 35
 The district court in this case misconstrued the pertinent inquiry regarding similarity of duties. The Court in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), stated that consideration of the nature of the service and its relation to the on-call waiting time is relevant in determining whether on-call waiting time is compensable. See Id. at 137, 65 S.Ct. at 163. The Townsend court's consideration of the similarity between regular duty and non-productive, on-call waiting time is in accord with Skidmore. However, in this case, the district court compared actual work conducted on-call with regular on-duty work to conclude merely that coroners' on-call investigations are substantially the same work as on-duty investigations. This conclusion is irrelevant. The coroners are paid a guaranteed minimum for actual work conducted on-call at a rate of one and one-half times the regular hourly rate. At issue here is what compensation is required for on-call waiting time. Thus, the relevant inquiry is whether on-call waiting time is substantially similar to regular on-duty work.
 
 
 36
 While on-call, coroners have participated in hobbies, entertained friends and family, went on outings, read, watched television, and slept. The record does not reflect that they did any of these activities while on duty. Consequently, we conclude on-call waiting time is not substantially similar to regular on-duty work conducted at the Coroner's Office.
 
 2. Required Response Time
 
 37
 The proper inquiry regarding required response time is "whether a fixed time limit for response [is] unduly restrictive." Owens, 971 F.2d at 351. The district court found "that there was no explicit response time required for a coroner to report to the scene of a death, and there was no specific response time to initiate a telephone investigation of a coroner's case." Berry, 791 F.Supp. at 1403. The district court did find, however, that coroners are required to respond to a page or telephone call reporting a death within fifteen minutes. Id. Further, it noted that in actual practice, coroners initiate investigations "as soon as possible." Id.
 
 
 38
 We have not established what constitutes an unduly restrictive response time. However, other courts have held that on-call waiting time was not compensable even though employees were required to respond, in person at the employer's premises, within approximately twenty minutes of receiving a page or telephone call. See Armitage v. City of Emporia, Kan., 982 F.2d 430, 432-33 (10th Cir.1992); Bright, 934 F.2d at 676; Norton v. Worthen Van Serv., Inc., 839 F.2d 653, 654 (10th Cir.1988). But see Renfro v. City of Emporia, Kan., 948 F.2d 1529, 1532 (10th Cir.1991) (twenty minute response time supports holding that on-call time is compensable), cert. dismissed, --- U.S. ----, 112 S.Ct. 1310, 117 L.Ed.2d 510 (1992). In this case, the only required response time is fifteen minutes to answer a page or telephone call, not in person or at the employer's premises, but by telephone or two-way radio. This required response is substantially different than being required to return to the employer's premises within twenty minutes. We conclude the required response by telephone or two-way radio within fifteen minutes is not a factor prohibiting the coroner's personal pursuits.
 
 3. Use of Pager to Ease Restrictions
 
 39
 Regarding the coroners' ability to use pagers, the district court concluded "that the pagers were not 100% reliable and so their benefit, if any, to [the coroners] was only partial." Berry, 791 F.Supp. at 1407. However, the proper inquiry is "whether use of a pager [can] ease restrictions," Owens, 971 F.2d at 351, not whether the pager is 100% reliable. In this case, the coroners are not required to use a pager, but may voluntarily do so. By being able to use a pager, the coroners are not restricted to areas with a telephone or two-way radio. As a result, we conclude the coroners' use of pagers eases restrictions while on-call and permits them to more easily pursue personal activities.
 
 4. Ability to Trade On-Call Shifts
 
 40
 The district court found that "in actual practice, the [coroners] seldom voluntarily traded on-call shifts," and found the primary reason for seldom trading was the coroners' "unwillingness to impose on each other's off-duty time." Berry, 791 F.Supp. at 1409. Based on these findings, the district court concluded "with so few coroners, there was little to be gained by trading on-call time." Id.
 
 
 41
 The proper inquiry is "whether the on-call employee [can] easily trade on-call responsibilities." Owens, 971 F.2d at 351 (emphasis added). There is no evidence that the coroners are unable to trade shifts or have had difficulty at any time trading shifts. Conversely, the evidence shows coroners have traded shifts without difficulty, including on special occasions and to maintain secondary employment such as teaching. See Berry, 791 F.Supp. at 1409. Because there is no policy against trading shifts and no evidence to support a conclusion that trading shifts is difficult, we conclude the coroners can easily trade shifts. The fact that coroners seldom are willing to impose upon one another's off-duty time does not mean they cannot easily trade shifts if they seek to trade.
 
 5. Excessive Geographical Limitations
 
 42
 Only if geographical restrictions are excessive is the employee restrained from engaging in personal activities. See Owens, 971 F.2d at 351. As a practical matter, if an employee is not required to remain on the employer's premises, geographical restrictions are imposed according to the required response time for an employee to return to the employer's premises. See Armitage, 982 F.2d at 432 (employee required to respond to employer's premises within twenty minutes); Bright, 934 F.2d at 676 (same); Norton, 839 F.2d at 654 (same). In such cases, the employee while on-call may only travel that distance from the employer's premises which can be traveled safely within the required response time.
 
 
 43
 As previously noted, the only required response time imposed upon the coroners is a fifteen minute response by telephone or two-way radio to a death report. Because the coroner is not required to return to the employer's premises, the fifteen minute response time does not impose any geographical limitation except that the coroner must be within fifteen minutes of a telephone or two-way radio. We conclude this restriction is not an excessive geographical restriction.
 
 6. Personal Activities of the Coroners
 
 44
 The district court erred in concluding the coroners were engaged to wait because they cannot pursue certain personal activities. The district court found:
 
 
 45
 They did not engage in activities which would make it difficult for them to respond promptly to a call. They did not pursue social activities with their families while on call, both because of the restriction on having family members in their County vehicles and because they could be interrupted. They limited their consumption of alcohol to the extent that they wanted to present a sober image if they had contact with the public. For the same reason they refrained from strenuous or dirty activities like yard work or car maintenance while on-call, in order to be presentable to the public in case they would have to report in person to a death scene.
 
 
 46
 Berry, 791 F.Supp. at 1412. Based on these findings, the district court concluded, "[w]hile on-call [the coroners] remained in a state of readiness to work; they were engaged to wait." Id. at 1413.
 
 
 47
 The inquiry, however, is not whether the coroners are prevented from participating in certain personal activities, but whether they actually engage in personal activities during on-call shifts. Owens, 971 F.2d at 351. As previously noted, an employee need not have "the same flexibility or freedom as he would if not on call" to engage in personal activities in order to conclude that he can use on-call time effectively for his own purposes. Id. at 350-51 (internal quotation omitted). Although the coroners are unable to engage in certain pursuits, it is undisputed that while on-call coroners have actually been able to socialize with friends and family, dine out, shop, read, watch television and enjoy hobbies such as gardening, working on antique cars, leather crafts and photography. Also, two coroners actually held secondary employment. Siebe, although not a party to this appeal, had firewood and machine shop businesses when he was a deputy coroner, and Berry taught classes at a local community college and answered calls for a voluntary fire department of which he was Battalion Chief. Berry, 791 F.Supp. at 1412.
 
 
 48
 As the district court noted, the ability of coroners to maintain secondary employment while on-call undermines the coroners' position that they are unable to actually pursue personal activities. Id. at 1409. Furthermore, other courts have held employees were able to use their on-call time effectively for their own personal purposes where they could pursue personal activities similar to those pursued by the coroners while on-call. See Bright, 934 F.2d at 676 (employee able to carry on personal activities at home, shop and dine out); Halferty v. Pulse Drug Co., Inc., 864 F.2d 1185, 1189 (5th Cir.1989) (employee able to visit friends, entertain guests, sleep, watch television, do laundry and babysit); Norton, 839 F.2d at 655 (employees able to spend time at friends' homes, church, laundromats, restaurants, pool halls, and local gymnasium, and to pursue hobbies); but see Renfro; 948 F.2d at 1532 (holding on-call time compensable even though employees participated in sports activities, socialized, attended business meetings, shopped, dined out, babysat and performed household chores). We conclude the coroners have actually engaged in personal activities, thereby effectively using on-call time for their own personal purposes.
 
 7. Frequency of Calls
 
 49
 Perhaps the only factor to support a conclusion that on-call waiting time is compensable in this case is the frequency of calls. Although the parties disagree as to the frequency of calls resulting in call-backs, they agree that the frequency of all death reports while on-call have been approximately one every 3.97 hours in 1987; one every 3.82 hours in 1988; one every 8.33 hours in 1989; one every 8.19 hours in 1990; and one every 7.93 hours in 1991. Relying on these statistics, the coroners receive a death report, on average, once every 6.45 hours.[8]
 
 
 50
 The district court relied heavily on Renfro, 948 F.2d at 1529, to conclude that a crucial factor in determining compensability is the frequency of calls. See Berry, 791 F.Supp. at 1404. In Renfro, the court held on-call waiting time compensable where fire fighters had to report to the stationhouse within twenty minutes of being paged or be subject to discipline, received three to five calls per twenty-four hour on-call period, and had difficulty securing secondary employment and trading on-call shifts. See Renfro at 1534-1536. In distinguishing Renfro from its previous cases holding that on-call waiting time was not compensable, see Boehm v. Kansas City Power and Light Co., 868 F.2d 1182, 1185 (10th Cir.1989); Norton, 839 F.2d at 656, the court relied on the frequency of call-backs and the nature of the fire fighters' employment. It concluded that because fire fighters had to lie "in wait for emergencies" in order to respond "alert and ready to protect the community" as frequently as three to five times in a twenty-four hour shift, they could not use on-call time effectively for their own personal pursuits. Renfro, 948 F.2d at 1538.
 
 
 51
 The coroners' case can be easily distinguished from Renfro. The coroners have no required response time in which they must return to the employer's premises, and as a result, they have no geographical limitations and are not subject to discipline. Also, the coroners have not shown any difficulty trading shifts and have been able to maintain secondary employment. Furthermore, the nature of the coroners' employment does not require response to emergencies in progress as does a fire fighter's employment. See Armitage, 982 F.2d at 432 (distinguishing Renfro because detectives required to respond to crimes already committed not emergencies in progress).
 
 
 52
 Although the frequency of calls arguably supports a conclusion that coroners are engaged to wait, all other factors, including an absence of an on-premises living requirement, geographical limitations, response time, and an ability to easily trade shifts and to actually pursue personal activities support a conclusion that the coroners are free to pursue personal activities while on-call. Because this court has held that no one factor is dispositive, Owens, 971 F.2d at 351, and all but one of the relevant factors weigh in favor of concluding the coroners are free to pursue personal activities, we conclude that the coroners can effectively use on-call time for personal pursuits.
 
 
 53
 Sonoma County also argues application of the FLSA to it violates the Tenth Amendment. Because Sonoma County raised this issue for the first time on appeal, we decline to review it. In re Wind Power Sys., Inc., 841 F.2d 288, 290 n. 1 (9th Cir.1988) ("As a general rule, the court of appeals does not consider issues raised for the first time on appeal."). Additionally, because we conclude the district court erred in granting judgment for the coroners, we need not address the coroners' cross-appeal challenging the district court's denial of liquidated damages pursuant to 29 U.S.C. Sec. 216(b) and rejection of a three year statute of limitations pursuant to 29 U.S.C. Sec. 255(a) and requesting attorneys fees.
 
 CONCLUSION
 
 54
 Despite the district court's conclusion that the coroners must be compensated for on-call waiting time, a majority of its findings support the opposite conclusion. The two predominant factors to be analyzed in determining whether on-call waiting time is compensable weigh in favor of reversing the district court. The existence of express and constructive agreements and collective bargaining agreements evidence the coroners' agreement to Sonoma County's overtime compensation policy. Further, the district court's findings support the conclusion that coroners are able to effectively use on-call time for personal pursuits. As a result, we hold the time that coroners spend waiting on-call for actual work is not compensable under the FLSA.
 
 
 55
 REVERSED.
 
 
 
 *
 Honorable David A. Ezra, U.S. District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 The district court's opinion is reported at Berry v. Sonoma County, 791 F.Supp. 1395 (N.D.Cal.1992)
 
 
 [2]
 There is no written policy requiring a fifteen minute response time, although the Sheriff's Department Policy and Procedure Manual Sec. 21.29 requires "a deputy coroner shall be dispatched immediately" upon the report of a death
 
 
 [3]
 The Sheriff's Department Policy & Procedure Manual Sec. 14:34 provides that "[c]itizens will not be transported in Departmental vehicles unless necessary to accomplish a Departmental purpose."
 
 
 [4]
 This decision is reported at Berry v. County of Sonoma, 763 F.Supp. 1055 (N.D.Cal.1991)
 
 
 [5]
 Sonoma County contends agreements regarding overtime compensation are dispositive, relying on General Elec. Co. v. Porter, 208 F.2d 805 (9th Cir.1953), cert. denied, 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954), and Rural Fire Protection Co. v. Hepp, 366 F.2d 355 (9th Cir.1966). We reject this contention. These cases address the specific issue of whether sleeping time is compensable. The regulations state that implied and express agreements are dispositive with respect to compensation for sleeping time. See 29 C.F.R. Secs. 553.222(c) and 785.22(a). However, in cases addressing whether on-call waiting time is compensable, agreements, although a predominant factor to be considered, are not dispositive. See Owens v. Local No. 169, Ass'n of W. Pulp and Paper Workers, 971 F.2d 347, 354 (9th Cir.1992) (agreement is relevant but not always controlling)
 
 
 [6]
 The five percent base salary increase which was implemented in 1982 was not compensation for on-call waiting time. Instead, the district court found that the five percent increase was a premium for expertise. Berry v. Sonoma County, 791 F.Supp. 1395, 1415 (N.D.Cal.1992)
 
 
 [7]
 Oravetz began in 1988; McAllister began in 1989; and Marcus was employed from 1983 until 1988
 
 
 [8]
 The district court found "the average frequency of calls requiring a coroner to respond by telephone while on-call was one per 4 hours on-call." Berry v. Sonoma County, 791 F.Supp. 1395, 1405 (N.D.Cal.1992). In their briefing, the parties agreed to statistics which make the district court's conclusion implausible. Consequently, we rely on the statistics offered by the parties for our analysis