No. DA 06-0085

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 110

JOE SANDS and RHONDA SANDS,

        Plaintiffs and Appellants,

   v.

TOWN OF WEST YELLOWSTONE,

        Defendant and Respondent.

APPEAL FROM: The District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 2003-625,
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Stephen C. Pohl, Paul Grigsby, Aspen Professional Center,
                Bozeman, Montana

        For Respondent:

                Philip F. Walsh, Walsh & McKenna, P.C., Bozeman, Montana

Submitted on Briefs: November 28, 2006

Decided: May 8, 2007

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Joe and Rhoda Sands, former emergency medical technicians (EMTs) for the Town of West Yellowstone (Town) sued the Town for failing to pay them for the hours they were on-call but were not actually responding to a call.  The Sands moved for partial summary judgment seeking a determination that these on-call hours constituted compensable work under the Fair Labor Standards Act (FLSA).  The Town opposed the Sands' Motion and filed a cross-motion for complete summary judgment arguing that the subject on-call hours did not constitute compensable time under the FLSA.  After a hearing, the District Court denied the Sands' Motion and granted the Town's Motion.  The Sands appeal.  We reverse and remand.

## ISSUE

¶2     A restatement of the issue on appeal is: Did the District Court err in determining as a matter of law that on-call time scheduled for the Sands was not compensable under the FLSA?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     West Yellowstone, Montana, is a small town on the west edge of Yellowstone National Park.  Its location makes it a desirable tourist destination for several months of the year, but during off-season, amenities such as fresh food shipments, bulk item and dry goods grocery shipments, restaurants, and theaters are limited or unavailable.  However, the Town's setting offers seasonal quiet and solitude and various year-long recreational activities such as hiking, camping, biking, fishing, snowmobiling and hunting, among others.

¶4      The Town provides a year-round municipal ambulance service for residents and guests which is staffed by paid EMTs and volunteers from the community. Rhoda Sands was hired as an EMT by West Yellowstone in November 1998. Joe began working as an EMT for the Town in September 1999. They worked for the Town as EMTs until August and December 2003, respectively. During the time they lived and worked in West Yellowstone, the Town had extremely limited professional services and stores to meet personal needs. For example, it did not have an advanced medical facility or specialized medical diagnostic facility, nor did it have a doctor, an optometrist, a dentist, a lawyer, a car dealer, or a full-time veterinarian.

¶5      During the time the Sands worked for the Town as EMTs, the Town employed a total of four EMTs. The EMTs were subject to two types of shifts: station time and on-call time. While on-call, EMTs worked "response time" when they received an emergency call. EMTs were paid an acceptable wage for station time and response time; however, they were paid one hour's wage for every four hours of scheduled on-call time, which they contest.

¶6      The closest hospitals were located in Bozeman, Montana, and in Rexburg, Idaho, both approximately eighty miles from West Yellowstone. The Sands testified that it took a minimum of three hours to transport a patient to one of these hospitals. The Town acknowledged that response time to transport a patient to one of these hospitals or to an interim pick-up location was typically between one and one-half hours and eight hours.

¶7      Between the hours of 8 a.m. and 8 p.m., on-call EMTs were required to respond to emergency calls within five minutes. Between 8 p.m. and 8 a.m., they had to respond

within seven minutes. If an EMT failed to meet the required response time, he or she was subject to disciplinary action. The only other restriction imposed on the emergency workers while on-call was the necessity to refrain from alcohol use. It is undisputed that each time an EMT was called out to respond to an emergency call, he or she faced a potential life or death situation.

¶8 Town EMTs were provided with radios to monitor emergency calls. These radios also transmitted police dispatches on the same frequency. The Town stated that it offered pagers to on-call EMTs as well.

¶9 Rhoda testified that during her interview for the EMT position, the interview committee told her that in addition to her regular station time, she would "occasionally" be scheduled for on-call shifts on holidays and weekends but that because volunteers were available nights, weekends, and holidays, such times would be rare. She testified in her deposition however that at some time after she began working for the Town, the volunteers began accepting fewer on-call shifts, and the four paid EMTs were required to take more and more of those shifts in order to guarantee that the Town had emergency ambulance services available twenty-four hours a day, seven days a week.

¶10 While on-call at night the Sands maintained that they had to keep the radio near their bed in order to hear a call and to meet the required response time. Rhoda testified that over the years of being on-call she experienced serious sleep deprivation resulting in health problems and the need for medical treatment for exhaustion. No evidence was presented by the Sands or the Town that the Sands used the pagers the Town claimed it provided to on-call EMTs.

¶11    It is undisputed that the Town of West Yellowstone is small enough that an on-call EMT could be anywhere in Town and respond to an emergency call within five or seven minutes.  However, the Sands complain that meeting such a short response time greatly interfered with their ability to use their on-call time effectively for their personal interests.  They could not conduct any personal or professional business outside of West Yellowstone, such as seeing a doctor or a dentist, attending an out-of-town cultural event or visiting out-of-town friends or family; they could not comfortably entertain guests in their home or visit friends for meals because of the frequency of call-outs; and they could not go hiking, fishing, camping or even take long walks.  The Sands also argue that because the number of EMTs and available volunteers was so limited, trading on-call hours was difficult and at times impossible.  Also, while both of the Sands held outside employment to supplement their EMT income, they were not able to work those jobs while they were on-call.

¶12    The Town counters that the only restrictions imposed on the Sands while they were on-call were to respond within five to seven minutes and refrain from the use of alcohol.  It asserts that the Sands were free to ride their bikes, shop for groceries and eat with friends during their on-call hours.

¶13    As volunteer participation diminished and the Town decreased station time and increased on-call time, the Sands became increasingly dissatisfied with their jobs, particularly the amount of on-call hours they were scheduled and the way on-call hours were compensated.  In 2001, Joe approached management with an alternative method of scheduling and paying for on-call work.  The Town implemented the method but within a

few months was told by the Federal Department of Labor that it could no longer utilize the implemented method because the exemptions involved applied to firefighters and not EMS staff.

¶14 The Sands ultimately resigned from the Town in 2003. In December 2003, they filed a Complaint against the Town alleging that under the circumstances associated with on-call time as EMTs, their activities were so restricted as to render their on-call time "work time," and thus fully compensable under the FLSA. On April 28, 2005, the Sands filed a Motion for Partial Summary Judgment and the Town filed a Motion for Complete Summary Judgment. Each party proffered "uncontroverted" facts supporting its position. Discovery ensued and on September 8, 2005, the District Court held a hearing on the parties' summary judgment motions. On October 26, 2005, the court granted the Town's Motion for Complete Summary Judgment and denied the Sands' Motion for Partial Summary Judgment. The court concluded that under the circumstances of this case, the Sands' on-call time was not compensable under the FLSA. This appeal follows.

## STANDARD OF REVIEW

¶15 We review a district court's grant of summary judgment de novo, using the standard established by M. R. Civ. P. 56 (Rule 56). The moving party must establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 11, 331 Mont. 281, ¶ 11, 130 P.3d 1267, ¶ 11 (citations omitted). Once the moving party has met its burden, the opposing party must, in order to raise a genuine issue of material fact, present substantial evidence essential to one or more elements of its case rather than mere conclusory or speculative statements.

6

We review a district court's conclusions of law to determine whether they are correct. *Kullick v. Skyline Homeowners Ass'n, Inc.*, 2003 MT 137, ¶ 13, 316 Mont. 146, ¶ 13, 69 P.3d 225, ¶ 13 (citation omitted).

¶16 We have repeatedly held that summary judgment is an extreme remedy and "should never be substituted for a trial if a material factual controversy exists." *Hajenga v. Schwein*, 2007 MT 80, ¶ 11, 336 Mont. 507, ¶ 11, ___ P.3d ___, ¶ 11. "To determine the existence or nonexistence of a genuine issue of material fact, we look to the pleadings, depositions, answers to interrogatories, admissions on file and affidavits." Additionally, all reasonable inferences that might be drawn from the offered evidence will be drawn in favor of the party opposing the summary judgment motion. *Hajenga,* ¶ 12.

¶17 Application of these standards becomes more complicated in circumstances such as those in *Hajenga* and the case at bar where both parties file simultaneous motions for summary judgment. We stated in *Hajenga* that

> [w]hen faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other. . . . "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."

*Hajenga,* ¶ 18, (citing *Ike v. Jefferson Nat. Life Ins. Co.*, 267 Mont. 396, 399-400, 884 P.2d 471, 474 (1994)). "[T]he fact that both parties have moved for summary judgment does not establish, in and of itself, the absence of genuine issues of material fact." *Hajenga*, ¶ 18 (citing *Montana Metal Buildings, Inc. v. Shapiro,* 283 Mont. 471, 477, 942 P.2d 694, 698 (1997)).

DISCUSSION

¶18 Both parties maintain that this case required the District Court to make a legal determination as to whether the Sands' on-call time was compensable under the FLSA and therefore the matter was suited to resolution by summary judgment.

¶19 Precedent addressing the question of whether on-call time is compensable under the FLSA has been evolving since 1944 when the United States Supreme Court established the standard for compensability to be whether the employee was "engaged to wait" or was "waiting to be engaged" while on-call. If the employee was engaged to wait, the on-call time was compensable. If waiting to be engaged, the on-call time was not compensable. *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161 (1944). In this landmark case, the U.S. Supreme Court reasoned:

> [W]e hold that no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time. We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. . . . Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged.

*Skidmore*, 323 U.S. at 136-37, 65 S. Ct. at 163 (internal citations omitted). In *Armour & Co. v. Wantock*, the Supreme Court cautioned that, when determining whether "inactive duty is duty nonetheless," the question is "[w]hether [the] time is spent predominantly for the employer's benefit or for the employee's"; this question, the Court concluded, is "dependent upon all the circumstances of the case." *Armour*, 323 U.S. 126, 133, 65 S. Ct. 165, 168 (1944). While *Armour* and *Skidmore* address circumstances contemplated

8

under the FLSA involving "employees engaged in commerce," the U.S. Supreme Court expressly extended FLSA application to state and local governments in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S. Ct. 1005 (1985). See also *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1541 (10th Cir. 1991) and *Berry v. County of Sonoma*, 30 F.3d 1174, 1182 (9th Cir. 1994).

¶20 Multiple state and federal courts have addressed the question of whether the on-call time in the case before them is or is not compensable under the FLSA. Predictably, the answers have varied, depending upon the particular facts at issue. As the District Court in the case at bar observed, the single Montana case addressing this issue, *Phillips v. Lake County*, 222 Mont. 42, 721 P.2d 326 (1986), does not control because it relies on a distinctly different judicial determination and dissimilar facts. Therefore, we look to cases from other jurisdictions with similar fact patterns for guidance in resolving the Sands' claim.

¶21 In *Shamblin v. City of Colchester*, 793 F. Supp. 834 (C.D.Ill. 1992), the plaintiff was a police officer for the City of Colchester. He sought summary judgment that he should be paid for his on-call time under the FLSA because he was restricted from effectively using his time for personal pursuits. The Illinois federal district court recited the undisputed facts which included immediate response time, geographic limitations, and required on-call shifts every other weekend, among others. The court also noted facts on which the parties did *not* agree, including (1) to what extent Shamblin could engage in personal pursuits during on-call hours; (2) the extent to which Shamblin was able to spend time with his children and friends while on call; (3) the extent to which

9

Shamblin could work at other jobs while on call; (4) the extent to which Shamblin was able to sleep while on call, and (5) the extent to which Shamblin could engage in activities such as doing laundry, watching movies, eating out, and getting groceries. *Shamblin*, 793 F. Supp. at 837. The *Shamblin* court concluded that when

> [v]iewing the inferences to be drawn from these and the other undisputed facts, and given the existence of disputed facts regarding the extent of Plaintiff's actual ability to engage in personal pursuits while on call, the Court cannot rule that Plaintiff is entitled to a judgment as a matter of law. Accordingly, Plaintiff's motion for summary judgment is denied.

*Shamblin*, 793 F. Supp. at 838.

Additionally, for the same reasons, the federal district court denied the City's motion for summary judgment as well. *Shamblin*, 793 F. Supp. at 838.

¶22 A North Carolina federal district court reached a similar conclusion in *Spencer v. Hyde County*, 959 F. Supp. 721 (E.D.N.C. 1997). The plaintiffs in *Spencer* were EMTs on Ocracoke Island in Hyde County, North Carolina. Much like the Sands in the case before us, they were required to respond to an emergency call in five minutes or less. While plaintiffs were otherwise free to conduct personal errands and activities while on-call, their emergency call-outs were more frequent during high tourist season and their response times were typically lengthy. The EMTs complained that with a five-minute response time, they were confined to the small village of Ocracoke which had few amenities; that while they were allowed to switch on-call shifts with other EMTs, it was difficult to do because there were so few EMTs; that they had to constantly monitor their radios which restricted them from attending noisy functions; and they could not engage in "customary island pursuits" such as walking on the beach, swimming, sailing, fishing, or

10

riding horses while on-call. *Spencer*, 959 F. Supp. at 725. As a result of these restrictions, the EMTs sought compensation for their on-call time. The County filed a motion for summary judgment seeking an order declaring that the on-call time was not compensable under the FLSA.

¶23    The North Carolina federal district court acknowledged that response time played a key role in many court decisions addressing compensability of on-call time. The court determined that the *O'Brien* case[1] involving EMTs was most closely aligned to the facts before it in *Spencer*. The court also found instructive a DOL Opinion Letter issued in 1988 conceding it was difficult to "reply unequivocally to the question of what constitutes restrictive on-call conditions" because each case must be decided on its particular facts, but concluding that "[b]ased on the facts in [the] particular case, it is our opinion that the 5-minute response time required by your EMTs is too restrictive for employees to effectively use on-call time for their own purposes. We would, therefore, consider the on-call time as compensable hours worked under the FLSA." Spencer, 959 F. Supp. at 727 (citing Paula V. Smith, *Hours Worked/EMTs/On-Call Time*, 6A Wage & Hour Man. (BNA) ¶ 31,780 (Nov. 16, 1988)).

¶24    Addressing facts strikingly similar to those before us here, the *Spencer* court held:

> In sum, while not identical to the facts of *O'Brien*, the court finds that the facts of this case, particularly due to the geographic limitations involved, pose perhaps more stringent restrictions on plaintiffs' use of their personal time than did the restrictions placed on the plaintiff in *O'Brien*. For example, because Ocracoke has only a few small food stores, plaintiffs claim they cannot go off the island to shop at a supermarket while on-call.

---

[1] *O'Brien v. Dekalb-Clinton Counties*, 131 Lab. Cas. (CCH) ¶ 33,320 (W.D.Mo. 1995), vacated in part on other grounds, 3 Wage & Hour Cas. 2d (BNA) 972, (W.D.Mo. 1996).

> Additionally, such routine personal tasks as going to the dentist or having car repairs done are impossible for plaintiffs to perform while on-call. In light of *O'Brien*, the [DOL] Opinion Letter, and all the facts and circumstances in this case, the court is persuaded that a reasonable jury could conclude that the plaintiffs are "engaged to wait" because of the degree to which the on-call time interferes with their effectively using this time for personal use. Therefore, [Hyde County's] motion for summary judgment is DENIED as to this issue.

*Spencer*, 959 F. Supp. at 727.

¶25 In the case before us, neither Sands nor the Town expressly refute the other's "undisputed" facts as is required when the burden shifts from the party moving for summary judgment to the non-moving party. However, our review of the record reveals facts, arguments and inferences upon which the parties disagree, and which bear directly on the issue presented. For example, the Sands maintain the Town incorrectly stated that Rhoda prepared the on-call schedules during the time she worked for West Yellowstone, that she did so without interference from her supervisors, and that she could have easily traded on-call time with other EMTs as a result. Both Rhoda and Joe maintain that it was difficult to trade on-call time due to the small number of EMTs. Moreover, Rhoda testified that she was responsible for scheduling on-call shifts for only about one and one-half years of her five years with the Town, and that her supervisors reviewed her schedules and changed them as they saw fit. Because both parties believe this scheduling issue bears on the Sands' ability to trade on-call time, it is relevant and material.

¶26 As in *Shamblin*, there also appears to be a question of how much Rhoda or Joe could work at their second jobs as a result of being on-call. Both testified that they could not work for other employers while on-call because of the short response time.

12

Practically speaking, if an employer allows employees to hold second jobs but the on-call requirements preclude them from effectively doing so, this too is a factor to be considered in determining the extent to which an employee actually engaged in personal activities during on-call time. See *Owens v. Local No. 169*, 971 F.2d 347, 351 (9th Cir. 1992), and *Spencer*, 959 F. Supp. at 725.

¶27 The Sands challenge the Town's argument that focuses on the "necessity and reasonableness" of the five-minute response time. The Sands do not dispute that the response time may be necessary and reasonable, but rather argue that such a short response time brings with it severe concomitant geographical restrictions. Geographical restriction is a factor to be considered when determining the compensability of on-call time. *Owens*, 971 F.2d at 351. The Sands further note that when the Town decided to rely more heavily on on-call staffing and less on station time, they were forced to bear substantially more on-call time, and as a result their non-working time decreased and opportunities to pursue personal interests became much more restrictive. As noted above, Rhoda testified that when she was hired, she was assured that on-call shifts would be few.

¶28 Additionally, the Sands argue that neither the Town nor the District Court considered the duration of the emergency calls. As noted above, these call-outs could be up to eight hours depending on the patient's needs. While EMTs were compensated for response, or call-out, time, the length of call-out time is nonetheless an important factor in considering compensability because of the impact it has on the EMTs' personal time. For example, being called away from a personal activity for thirty minutes to respond to

an emergency call would more likely allow the EMT to resume the activity upon his or her return than being called away for eight hours. *Spencer*, 959 F. Supp. at 725.

¶29 The Sands raise additional challenges to the District Court's conclusions which we deem it unnecessary to recount. While we acknowledge that both parties sought summary judgment, this does not mean that summary disposition is necessarily required or appropriate. *Hajenga*, ¶ 18. Rather, each motion must be evaluated on its own merits. Our de novo review convinces us that material facts are indeed disputed, as noted above, and that under the circumstances presented, a reasonable jury could return a verdict for either party. This being so, we are constrained to agree with the U.S. Supreme Court's reasoning in *Armour*, as well as that of the *Shamblin* and *Spencer* courts—i.e., whether the waiting time here should be deemed working time is a question of fact that is appropriately resolved by a trier of fact. Our conclusion notwithstanding, we commend the District Court for its prodigious effort to resolve the issue of the compensability of Sands' on-call time on summary judgment, as requested by the parties.

## CONCLUSION

¶30 For the foregoing reasons, we reverse the District Court's order of summary judgment in favor of the Town of West Yellowstone and remand for a jury trial on the merits of Sands' claim.

/S/ PATRICIA COTTER

14

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE